No. 18,921.

C. V. HALLENBECK *v.* GRANBY DITCH AND RESERVOIR COMPANY.

(357 P. [2d] 358)

Decided November 28, 1960.   Rehearing denied December 23, 1960.

Messrs. SPARKS, CONKLIN & CARROLL, for plaintiff in error.

Messrs. STEWART & BROWN, for defendant in error.

Opinion by MR. JUSTICE DOYLE.

THE Granby Ditch and Reservoir Company petitioned in the district court of Delta County for a decree entitling it to store water decreed to its system of reservoirs in whatever location and sequence it saw fit within the system — a so-called "blanket decree." C. V. Hallenbeck and Carl B. White objected to the petition on the grounds that the exercise of such options by the Reservoir Company would injure their interests as owners of junior rights to the waters of Dirty George Creek into which the water from the reservoirs flows. The trial court heard the evidence on both sides, found that the

change would work no injury to the interests of Hallenbeck, and entered a decree as requested in the petition. Hallenbeck brings error, seeking reversal of the judgment. The parties will be referred to as they appeared in the trial court, namely, as petitioner and objector.

The petitioner is a mutual water company engaged in the business of collecting, storing, and distributing water for agricultural and domestic purposes in the vicinity of Delta, Colorado. There are 700 shares of stock in the company held by some 50 persons. The objector owns 44½ and the City of Delta owns 94 shares. The storage system involved is located in the Grand Mesa in a watershed covering approximately two square miles and draining into Dirty George Creek (which name counsel assures us refers to the man after whom the creek was named and has no reference to the quality or purity of the water). There are twelve reservoirs in the system but only numbers one through eleven are covered by the petition and decree. The company depends on snow melting in the spring to fill its reservoirs each year. Approximately one-sixth of the watershed drains into reservoirs 1, 2 and 3 at the top of the system. The reservoirs are all located in natural lakebeds which have been dammed and have control devices installed and are all connected. See map on page 488.

The ditches on Dirty George Creek begin about two miles below the reservoirs, the headgate of the Granby ditch being located first. The Hoosier ditch of objector White is just below the Granby ditch and the other ditches are several miles further downstream. The storage rights of the reservoirs depend on decrees rendered in 1907 and in 1937. Some of the rights of objector are junior to the 1907 decrees of petitioner but senior to the rights adjudicated in 1937. There are other decrees of objector adjudicated in 1937 which are junior to the petitioner's 1937 rights. The amount and priorities decreed are set forth in the tables which follow — those of petitioner appearing in caps. It is to be noted in the

## MAP OF THE GRANBY RESERVOIR SYSTEM

Drainage Area = 1.4 Square Miles

tables that a.f. indicates acre feet and c.f.s. indicates cubic feet per second of time.

*Priority of Filling Decrees*
*of Petitioner and Objector*

(Petitioner's Decrees in Caps)

| Ditch or Reservoir | Priority No. | Year Adjudicated | Amount |
|---|---|---|---|
| GRANBY NO. 5 | 8 | 1907 | 287.00 a.f. |
| GRANBY NO. 10 | 9 | 1907 | 114.75 a.f. |
| GRANBY NO. 2 | 9 | 1907 | 57.40 a.f. |
| GRANBY NO. 11 | 10 | 1907 | 75,00 a.f. |
| GRANBY NO. 1 | 11 | 1907 | 57.43 a.f. |
| GRANBY NO. 3 | 14 | 1907 | 8.00 a.f. |
| GRANBY NO. 8 | 14 | 1907 | 11.50 a.f. |
| GRANBY NO. 9 | 15 | 1907 | 111.50 a.f. |
| GRANBY NO. 7 | 16 | 1907 | 12.00 a.f. |
| GRANBY NO. 6 | 19 | 1907 | 11.50 a.f. |
| Blake | 24 | 1907 | .62 c.f.s. |
| Bourn | 37 | 1907 | 1.00 c.f.s. |
| Obert | A-28 | 1914 | 1.50 c.f.s. |
| Obert | A-46 | 1914 | 3.00 c.f.s. |
| Perkins | A-71 | 1914 | 1.50 c.f.s. |
| Eagle | A-101 | 1914 | 9.70 c.f.s. |
| GRANBY NO. 1 | H-29 | 1937 | 57.43 a.f. |
| GRANBY NO. 2 | H-29 | 1937 | 114.77 a.f. |
| GRANBY NO. 6 | H-29 | 1937 | 34.48 a.f. |
| GRANBY NO. 7 | H-29 | 1937 | 64.08 a.f. |
| GRANBY NO. 11 | H-29 | 1937 | 11.75 a.f. |
| Bourn | H-43 | 1937 | .50 c.f.s. |
| Red Haw | H-68 | 1937 | 2.50 c.f.s. |
| Rule | H-119 | 1937 | 3.00 c.f.s. |
| Perry | H-134 | 1937 | .50 c.f.s. |
| Obert | J-48 | 1954 | 3.00 c.f.s. |
| Eagle | J-293 | 1954 | 1.30 c.f.s. |
| Blake | J-330 | 1954 | 1.13 c.f.s. |
| Valley View | J-332 | 1954 | 2.00 c.f.s. |

The injuries that objectors allege they would suffer appear in the objections filed; in the pre-trial statement; and in the amendment to the objections made during the trial. The gist of the objections of Hallenbeck is that under the requested decree the reservoirs would be allowed to fill from sources other than contemplated in the original decrees and that water previously available to him would be stored by petitioner. The objections filed by White alleged that no plan was filed to show that no injury would be caused; that water previously available to him would be withheld.

In a pre-trial memorandum, counsel for Hallenbeck specified the nature of his objections. He stated that the system had never held and would not then hold the amount of water decreed. He also stated that it was not his contention that any of the original capacity had been abandoned; that the decree to the extent it exceeded the original capacity was void since there is an implied limitation in every decree which restricts storage rights to actual capacity. A further objection was that the present location of the reservoirs is different from the original location, a change which was not authorized.

Subsequent to the trial, counsel for the objectors moved to amend their pleadings to conform to the evidence and alleged that the maximum capacity of the reservoirs from the date of their respective decrees was 569.7 feet and that any amount decreed in excess thereof has been abandoned.

At the trial, the president of the Reservoir Company testified that three of the reservoirs could hold no water, that the Forest Service required trees to be removed within five feet of the waterline before a reservoir could be rehabilitated, that this would cost approximately $2,500 for Reservoir No. 2, and that they would prefer to store the water in one of the other reservoirs where evaporation would be reduced and where it could be administered more conveniently. No witness for the

petitioner testified as to exactly what plan for storage would be used if the decree were granted, although it was indicated that one possibility was to raise the dam on No. 11 to increase the capacity of Nos. 5, 10 and 11 and store the water from Nos. 1 and 2 there.

Objector offered expert testimony of a civil engineer who had surveyed the reservoirs and the reservoirs could not hold the 1047 acre feet decreed to them, and that even if Nos. 2, 3 and 8, which were then unable to hold any water, were repaired the total capacity would be only 569.7 acre feet. The trial court ruled that this evidence was admissible only on the issue of abandonment and that it would not be considered on the question of injury as a result of change in place of storage. The only testimony to show capacity at the date of the decree was to the effect that there was no indication that the then capacity differed from any previous capacity. The testimony of both the engineer and the objector in this respect was with reference to the preceding twenty years only.

The evidence introduced by petitioner as bearing on capacity was that the system had distributed to their stockholders 1000 acre feet of water in each of seven years between 1937 and 1950, and with 400 acre feet stored in No. 12 as it was during that period, they were able to meet the demands of all their users. An engineer witness for petitioner admitted that if the relief sought by petitioner were granted less water would flow down the creek than now flows. Whether he meant that this would be the result of expansion of storage facilities or of the compensating effects of more flexible use of existing storage facilities is not clear.

Much testimony was concerned with when the various reservoirs filled. This was conflicting and somewhat ambiguous. Witnesses for objector said that the snow melt began earlier in the vicinity of the lower reservoirs, such as Nos. 7 and 11, and that consequently these reser-

voirs filled and spilled from one to three weeks earlier than did the reservoirs at the upper part of the system. The latter were said to be in wooded country which retarded the snow melt. Witnesses for the petitioner, on the other hand, stated that Reservoir No. 1 filled at the same time as did Nos. 7, 10 and 11 and that No. 1 is considered a "sure filler." An officer of the petitioner did concede that No. 7 would usually spill before No. 1. Presumably the controls in No. 7 were set to allow it to spill when its senior decree of 12 acre feet had been stored, and apparently this was the spill to which reference was being made. The testimony was not clear as to the difference in time between the spill from No. 7 at 12 feet and from No. 1 at 57.43 acre feet.

Objector argued that if No. 7 is allowed to accumulate the quantity now assigned to No. 2, substantial prejudice will result in that he would be delayed in exercising his rights, and this would amount to a prejudicial change.

The water commissioner for the district where the reservoirs are located testified that many of the junior decrees are satisfied only by floodwater from a heavy runoff in the spring. Objector himself stated that he depended on spring peak flow. He also pointed out that in many years there was sufficient water available between the reservoirs and the ditches to satisfy the junior ditch decrees apart from the floodwater. On cross examination he said that if the requested relief were granted the petitioners would probably be able to move their appropriations, junior and senior, indiscriminately to their best advantage.

In its findings of fact and decree the trial court adopted the petitioner's version with respect to all of the evidence and it also adopted petitioner's theories as to the law of the case. The court found that all eleven of the reservoirs filled from the same source; that "the continued use of said reservoirs will be the same as has been in the past, that there will be no increase in the

duty of said reservoir waters, nor will said waters be used in a different way or place than is now being used." A further finding of the trial court was that there had been no abandonment of the adjudicated rights by the petitioners and that their storage of such waters has been "largely the same from year to year, except perhaps during exceptionally dry years." The court also found "that objectors cannot insist that the conditions in the past remain the same because of the breaking of the dams and leaking of the same which has been for their benefit and to the detriment of the petitioners; in other words, they cannot insist upon a continuation of the petitioners' misfortunes, to furnish them water. The Court must find that the change in storage rights will have no injurious effect upon the objectors' vested rights."

The trial court made no specific finding with respect to injury to the objectors apart from the general observation quoted immediately above. The court concluded that by granting the petition and holding that the decrees previously entered be strictly observed, petitioners will not be allowed to take more water than was previously decreed to them in 1907 and 1937. The final conclusion was that the reservoirs be incorporated into one storage unit under the name of Granby Reservoir System "with the right to store water decreed to said reservoirs from the present sources of supply as provided in the several decrees."

It should also be mentioned that by refusing to consider testimony as to capacity of the several reservoirs except as bearing upon the issue of abandonment, the court in effect precluded a showing by objectors that the change would produce injury.

In urging reversal, objectors argue:

First, that the court erred in limiting the testimony as to capacity of the reservoirs to the issue of abandonment in view of the fact that petitioner was in effect

seeking a decree authorizing it to enlarge its reservoirs to the detriment of junior right holders.

Secondly, that a modification would result in changed stream flow conditions which would operate to the detriment of junior appropriators.

Third, that there was an abandonment of the rights established by the decree to the extent of the difference between the quantity awarded and the actual reservoir capacity.

The action was treated by counsel and the court as having arisen under C.R.S. '53, 147-9-22, relative to modification of decrees by changing the point of diversion of ditches or other structures or by changing the location of reservoirs or other structures.

This section allows an owner or claimant of a water right desiring modification of a decree by changing his point of diversion to file in the court which entered the adjudication decree a petition in writing, setting forth among other things, the point of diversion as fixed by the decree; the new point of diversion sought by the petitioner; a list of ditches and reservoirs taking water from the same source with the names and addresses of the owners or claimants thereof so far as known to the petitioner; an allegation that the proposed change will not injuriously affect the vested rights of others or if it has injurious effect on the vested rights of others the terms and conditions suggested by the petitioner to prevent such injurious effect and to protect the parties affected.

I.

One obvious and basic fault in the petition and the decree in the present case is found in its blanket character. The petitioner would be given a free hand to move its priorities junior and senior from one reservoir to another as it saw fit without regard to the rights of the junior appropriators. Thus it violates the basic and fundamental requirement of the statute that the new point of location be specifically set forth. Petitioner was required to show its proposed change with particu-

larity. As a result of its failure to do so the court was not in a position to determine whether junior rights would be prejudiced, because the court had no gauge before it upon which to form a basis for a judgment. Theorization with reference to hypothetical conditions could not serve to protect the rights of junior appropriators.

II.

It appears from the evidence in the case that injury to junior right holders was threatened. The petitioner admits that less water would flow downstream as a result of the changes. It is also apparent from the evidence that if the petitioners exercise the priority which belongs to Reservoir No. 2 in connection with Reservoir No. 7, the objectors depending upon early spring flooding and overflow, it could result in prejudice to them. At present there is overflow following the accumulation of 12.5 acre feet. If, however, Reservoir No. 2's priority were moved to No. 7, there would be delay in this overflow and the objectors would be prejudiced in terms of time of enjoyment of their junior rights. Such delays could very well prove injurious and prejudicial. These are merely suggested as possible injuries and are not meant to exclude other possible detriments which may appear once the petitioner's plans are specifically set forth.

III.

This case was not tried with a view to determining whether injuries were posed to the junior right holders by the proposed change. Once the threatened injuries were apparent the second facet of Section 149-9-22 (7) came into play and the petitioners were required to suggest terms and conditions to prevent injurious effect and protect the parties affected. This they failed to do. The cases recognize that the petitioner under such circumstances has the burden of furnishing a plan for the protection of the vested rights of junior appropriators. *Farmers Res. & Irr. Co. v. Town of Lafayette,* 93 Colo. 173, 24 P. (2d) 756; *Vogel v. Minnesota Canal & Res. Co.,* 47 Colo. 534, 107 Pac. 1108; *Trinchera*

*Ranch Co. v. Trinchera Irrigation District,* 83 Colo. 451, 266 Pac. 204; *Colorado Springs v. Yust,* 126 Colo. 289, 249 P. (2d) 151; *Farmers Highline & Reservoir Co. v. Golden,* 129 Colo. 575, 272 P. (2d) 629.

In their brief the petitioners say that they have presented a plan. They say:

"In the present instance, the petitioner is simply asking for a blanket decree to store the water to which it is entitled in the same reservoirs on a given drainage system, primarily to move waters decreed to Reservoir No. 2 to Reservoirs Nos. 11 and 7 and also to explore the feasibility of enlargement of Reservoir No. 6 which is located immediately below No. 11. Since Reservoir No. 11 already includes and covers Reservoirs Nos. 4, 5, 8, 9, 10 and 11, whether Reservoir No. 2 is changed to No. 7 or No. 11, or even No. 6, the blanket decree is applicable actually to only four units, being No. 1, No. 6, No. 7 and No. 11. (No. 3 is quite small.)

"Under this plan, as soon as the group of reservoirs has received the 746.08 acre feet decreed in 1907, water would then be made available to decrees downstream junior to the 1907 decrees and senior to the 1937 decrees. The next water available is then applied to the Company's 1937 decrees and the matter of administration remains under the jurisdiction of the Water Commissioners."

The objection to this so-called blanket plan is that it fails to deal specifically with the questions of changed conditions if such change would affect the rights of junior appropriators. Essentially it proceeds on the premise that the petitioners are entitled to their full priority regardless of changed conditions and irrespective of whether they have made use of the water granted to them. In other words, they stand on the inviolability of their decrees. They take the position that the objectors are precluded from collaterally attacking those decrees. This is, of course, correct but it does not furnish an answer in this statutory action. The

statute and the cases contemplate a relative evaluation of rights with a view to protection of vested junior rights. In the *Trinchera Ranch* case, Mr. Justice Butler speaking for the Court suggested some of the factors which must be presented so that the court can be in a position to determine whether the proposed change would injuriously affect the vested rights of junior appropriators. Of importance, according to that opinion, "* * * is the size and capacity of the ditches from which and to which the change is sought; the quantity of water used, and the quantity it is intended to use after the change; the place where the acreage upon which it is intended to use the water after the change; the periods of non-use between successive irrigations of the land; the time of intended future use; * * *"

Further comments in the *Trinchera* case are fully applicable in the case at bar:

"* * * Scarcely any of these matters are in evidence here. Not that all, or even a large part, of such matters must be proven in order to show that the vested rights of others would not be prejudiced by the change; but much more is required than has been proven in the present case. It may fairly be said that here there is no proof whatever of matters absolutely necessary to enable a court to find that the vested rights of the protestants would not be injuriously affected if the proposed changes were permitted. * * *"

No basis for distinguishing between a stream and a reservoir is apparent. In a dictum in *Windsor Canal & Res. Co. v. Lake Supply Ditch Co.*, 44 Colo. 214, 98 Pac. 729, it is declared:

"* * * The change of place of storage or use from one reservoir to another, if not identical in principle, is analogous to a change of place of use of irrigating water from one tract of land to another. * * *"

Reason dictates that the statute and the cases should apply to a change of place of storage to the same extent as to a change of point of diversion on a stream. The

general principle that decrees are inviolate does not compensate for the failure of the court to treat specifically, and with reference to actual conditions, the issue of whether the proposed changes would interfere with vested rights.

It follows, therefore, that the judgment of the trial court must be reversed because:

First, petitioner's proposed change was too vague to comply with the statute and the rules laid down in the cases, as a consequence of which the court was not in a position to determine prejudice.

Second, notwithstanding some injury was apparent, the petitioner did not present any plan to alleviate or remove this injury and to protect the vested rights of other appropriators.

Third, the court failed to deal specifically with the evidence and to evaluate it with reference to specific and particular invasion of vested rights.

## IV.

■ Objector further argues that the trial court erred in its refusal to consider evidence as to the capacity of the reservoirs. He relies on *Trinchera Ranch Co. v. Trinchera Irrigation District,* supra, *Hoehne Ditch Co. v. Martinez,* 71 Colo. 428, 207 Pac. 859; *Fort Collins Milling & Elevator Co. v. Larimer & Weld Irrigation Co.,* 61 Colo. 45, 156 Pac. 140. These cases recognize evidence of extent of use to be relevant in proceedings of this nature.

We conclude, therefore, that it was error to limit such evidence to the issue of abandonment. Although it cannot be said that the testimony as to capacity offered by objectors had great probative value in determining the pivotal issue whether the change would injure objector's vested rights, it was nevertheless admissible as bearing thereon, notwithstanding the question of storage capacity of the reservoirs was not itself in issue. Specific and direct proof with respect to the objector's vested rights and evidence bearing on whether these rights would be violated by the proposed changes is called for.

The judgment is reversed and the cause is remanded for new trial or other appropriate proceedings. On retrial the parties should be permitted to amend their pleadings as they may be advised.

MR. JUSTICE MOORE and MR. JUSTICE FRANTZ concurring.