No. 20889.

C. V. HALLENBECK v. THE GRANBY DITCH AND
RESERVOIR COMPANY.
(420 P.2d 419)

Decided October 3, 1966. Opinion modified and as modified adhered to and petition for rehearing denied December 5, 1966.

Conklin, Carroll & Willett, for plaintiff in error.

A. Allen Brown, for defendant in error.

*En Banc.*

Mr. Chief Justice Sutton delivered the opinion of the Court.

This is a water reservoir storage case under C.R.S. '53, 147-9-22 involving a change in points of storage on Dirty George Creek in Delta County. The matter was here previously and was then remanded to the trial court for re-trial "* * * with the view to determine whether injuries were posed to the junior right holders by the proposed change." *Hallenbeck v. Granby Ditch and Reservoir Company,* 144 Colo. 485, 357 P.2d 358 (1960). We shall refer to C. V. Hallenbeck, the Plaintiff in Error, and sole present "objector" as such or by name, and, to the Defendant in Error, as Granby or the petitioner.

Reference should be made to the first *Hallenbeck* opinion for the prior history of this dispute, though on

retrial the case was heard on a different plan of development and some different facts. Suffice it to say here that at the re-trial it was shown that the map printed in 144 Colo. at p. 488, due to later discovered evidence, was not accurate in that Reservoir No. 10 actually is now located in the area of Reservoir No. 12, and, Reservoir No. 4 apparently has no decreed storage rights and is now part of Reservoir No. 5 and should be so considered. In addition, the chart listing the various decreed rights, which appears in 144 Colo. at p. 489, erroneously shows that Granby No. 1's 1937 adjudicated decree is 57.43 c.f. whereas it should read 76.02 c.f.

For the purposes of this writ of error we must now detail the pertinent events relating to the re-trial.

Granby, in its 1955 petition for change, sought a "blanket decree" for its purported 12 reservoirs. It desired to store its adjudicated waters wherever it wished in its reservoirs and in no particular sequence. Junior holders, below the point of discharge of Granby's waters, objected, claiming injury.

In 1961 the trial court, pursuant to the directive of this court, set the new trial and directed the petitioner to submit a plan on how it intended to fill its reservoirs. Granby was specifically to show that the plan would not harm vested junior rights. It appears that in the meantime, since the action originally began, petitioner had gone ahead and raised or changed the dams in Reservoirs referred to in the record as 5 - 11. The latter consisting of the map areas shown in 144 Colo. at p. 488 as Reservoirs 4, 5, 8, 9, 10 and 11. In our references to this group of Reservoirs hereafter it must be understood that No. 10 (now being part of No. 12) is considered, in fact, to be non-existent in that area and that No. 4 has no standing. We are thus dealing with the question as to whether the trial court properly granted petitioner's modified request to move the storage formerly decreed to Reservoirs 1, 2 and 3 to the new 5 - 11 area.

By February 5, 1962, petitioner submitted its first plan to repair and enlarge 5 - 11 and to move only 1 and 2 storage there. It stated that no injury would accrue to any junior appropriators. Hallenbeck, however, did object and after a pre-trial conference the court directed petitioner to file another plan and gave leave to file an additional statement. The record fails to disclose that any additional plan was filed, however, in March 1962 Granby did file an amended petition followed by a re-amendment in May 1962. Evidently this was considered to be a plan for this time petitioner sought to move No. 2 and 3 storage to 5 - 11; and, sought temporary storage in 5 - 11 of No. 1, the storage of No. 1 to be made permanent later.

Finally, the matter went to trial in December 1962. As stated above, by that time the plan and issue were whether No's. 1, 2 and 3 storage decrees could be moved to the enlarged 5 - 11 Reservoirs. At this time, for reasons that hereinafter appear, it should be noted that No. 9, which lies to the southeast of No. 5, is lower in elevation than 5 - 11 and is connected to 5 - 11 by a conduit.

Transposing the storage capacity in this action into figures we find that petitioner sought, and the trial court granted it, the right to relocate 313.62 a.f. of decreed water storage rights from No's. 1, 2 and 3 to an enlarged reservoir covering the old No's. 4 and 10 and the existing 5 and 11, the latter being connected with No's. 8 and 9 by conduits or ditches. We note, in this connection that the decrees for No's. 5, 8, 9 and 11 total 496.75 a.f. since No. 10 cannot be counted and No. 4 has no rights. This, plus 313.62 a.f. total for Reservoirs No's. 1, 2 and 3 totals 810.37 a.f. This contrasts with the 843.40 a.f. which the court actually found in this action could be stored in 5 - 11 and 9 and which would result in an over-decree (assuming the trial court was correct in ordering the change) of 33.03 a.f. if the court had carried the error through into its judgment, which it

fortunately did not do. The trial court also required, by its decree, that certain ditches and outlets have proper measuring devices installed and that petitioner could have three years from the date of judgment to perform necessary work and repairs on Reservoirs No's. 6 and 8 so that they could hold their decreed amounts.

Hallenbeck's motion for a new trial was denied in September 1963 and he seeks relief by writ of error urging six grounds for reversal which we summarize as follows:

(1) That under the guise of changing the place of storage from one location to another a Reservoir Company cannot properly enlarge its reservoir capacity to store more water than it had been storing prior to the change and thus deplete the stream to the damage of a downstream junior appropriator;

(2) That the actual amount of former storage in certain Reservoirs (here 1, 2 and 3) is important in this case and the burden of showing the amount thereof is on the petitioner;

(3) That as a matter of law the change sought here will injure the objector, irrespective of capacity and former usage, because the change is to a point alleged to be 1⅓ miles downstream, at a lower elevation with a larger watershed. Specifically, Hallenbeck asserts that the time of delivery of his decreed water is interfered with by Granby's new storage plan;

(4) That an abandonment occurred here as to certain of petitioner's rights since it had voluntarily breached one of the dams some years earlier, another dam had washed out, with neither being repaired, and, that none of these three reservoirs (1, 2 and 3) had ever, in the past, stored their full decreed amounts;

(5) That the trial court erroneously decreed a new place of storage for No. 10's waters for various reasons; and,

(6) That it was error to allow Granby three years in

which to repair its Reservoirs 6 and 8 so as to enable them to carry their decreed water.

Before commenting on Hallenbeck's claims of error it is well to note carefully just what the trial court held in its lengthy Findings of Fact, Conclusions of Law and Judgment. As pertinent here, in substance, it found:

(1) That the petitioner was not again seeking a "blanket decree";

(2) That the objector had the burden of proof to show that Reservoirs No's. 1, 2 and 3 *never* had the capacity to store all their decreed water; that such is an affirmative defense and that Hallenbeck failed to meet his burden;

(3) That the objector failed to meet his burden of proof as to his claim of abandonment; and,

(4) That the change in the place of storage will not injure the objector or other downstream junior appropriators.

In view of the intertwinement of facts and law involving Hallenbeck's first four grounds urged for reversal we shall now consider them together.

The evidence is that Granby has decreed rights to 133.45 a.f. of water storage for Reservoir No. 1, 172.17 a.f. for No. 2 and 8 a.f. for No. 3, a total of 313.62 a.f. That is what the trial court held could be transferred. The evidence is in dispute as to whether the distance is one-half mile or $1\frac{1}{3}$ miles from the outlet of No. 1 to the inlet of old No. 4. It seemingly depends on whether one goes as the crow flies or via the stream bed. We cannot see that such is too material, however, since all the waters in No's. 1, 2 and 3 eventually pass into what is now 5 - 11 and have always done so far above the point of Hallenbeck's take-out ditch. The only materiality being whether any water *now* spills over into No. 9 as will be discussed later herein. Also, there is disputed evidence as to the drop in elevation, the amount of forestation and even as to which direction one of the reservoirs drains in. There is no dispute that the watershed

at 5 - 11 is larger than that of 1, 2 and 3 or that the objector receives his water far below 5 - 11. On the other hand, the evidence is that there will be better water management if 1, 2 and 3 have their water stored in the enlarged 5 - 11 and also, that there will be much less surface evaporation, thus making more water available for all the parties.

 It is well to bear in mind here that the law relating to a change in the point of diversion on a stream is also generally applicable to a request for a change in a place of storage. *Hallenbeck, supra.* Appropriate to this comment it is well to consider next whether the objector can properly assert, in this action, that the petitioner's Reservoirs 1, 2 and 3 never had the storage capacity to hold their full decreed amounts of water. Granby asserts such is an attempted collateral attack — and we agree. Here petitioner's rights were decreed in 1907 and 1937. Each certified copy of a decree in the record recites the storage capacity claimed. Each such decree was open to attack on such ground only for the statutory periods prescribed by C.R.S. '53, 147-9-16 and 17, which time has long since passed. The decrees involved here in 1, 2 and 3 have become final and binding. *Hallenbeck, supra; Reagle v. Square S. Land and Cattle Co.,* 133 Colo. 392, 296 P.2d 235 (1956); *Quirico v. Hickory Jackson Ditch Co.,* 130 Colo. 481, 276 P.2d 746 (1954). Having failed to challenge within the time allowed, Hallenbeck cannot do so now except by asserting and proving abandonment or fraud. *Reagle, supra.*

 Hallenbeck next urges, however, that the rule against collateral attack protects a decree only to as much of the adjudicated water as has actually and subsequently been applied to a beneficial use, *i.e.,* here the amount actually stored in No's. 1, 2 and 3. We do not agree, for such is still a collateral attack when the correct course of action to raise this issue is by alleging abandonment as noted above. Even if such a rule existed it would not apply here anyway, as there is *disputed*

*evidence* as to the actual total amount stored in the three reservoirs before problems arose, with beavers damming the outlet of No. 1, various washouts and Forest Service problems on clearing timber. To reiterate, where the water in question has been once appropriated, and adjudicated decrees have entered which are non-contestable due to the passage of time, such an attack cannot be made. *See Arnold v. Roup,* 61 Colo. 316, 322, 157 Pac. 206 (1916), where this court said in disposing of a similar contention:

"The Simon ditch decree of 1892 is absolute. It settled the volume and priority of the ditch, and left no conditional provision as to volume open for future ascertainment and settlement in the same proceeding, * * *. *Beneficial application was adjudicated, and is not a condition left open by the decree for future ascertainment and settlement.* An adjudication decree must settle the volume of the appropriation or it is no adjudication. There is no middle ground. *If it fixes an amount which it leaves conditional, depending upon beneficial application, then nothing as to volume is settled.*" (Emphasis supplied.)

The court in *Arnold* distinguishes the case of *New Mercer Ditch Co. v. Armstrong,* 21 Colo. 357, 40 Pac. 989 (1895), relied upon by Hallenbeck and which is inapplicable here. That was an abandonment case where the evidence clearly showed non-use of a substantial amount of water after it had been adjudicated. See also *O'Brien v. King,* 41 Colo. 487, 92 Pac. 945 (1907).

The objector, however, urges that he has the right to prove non-capacity of the reservoirs under the law as set forth in *Green v. Chaffee Ditch Co.,* 150 Colo. 91, 104, 371 P.2d 775 (1962) and *Farmers Highline Canal and Reservoir Co. v. Golden,* 129 Colo. 575, 272 P.2d 629 (1954). By such an assertion Hallenbeck is confusing an alleged partial non-capacity of storage with abandonment of the water — the two not being the same, especially under these facts. Compare *Del Norte Irrig. Dist.*

*v. Santa Maria Reservoir Co.,* 108 Colo. 1, 6, 113 P.2d 676 (1941). Nor does an examination of the *Green* and *Farmers Highline* cases support such a contention. For example, in *Green* no full use was made of all the water originally decreed, as is the evidence in the instant case. And, in the *Farmers Highline* case we find no ruling that supports such a proposition. Nor could this be otherwise where the entire amount fixed by the decrees has been theretofore used by the owners thereof, as here.

██ In summary, it may be said that when a properly authenticated document showing a water decree is introduced, such document constitutes prima facie evidence of the petitioner's right to change the point of diversion or storage of an amount of water as is decreed on the face of the instrument. The burden is then placed on the objector to show that the petitioner had abandoned its right to a part thereof. From what we have heretofore said it is obvious that the objector's grounds one and two have no merit in the instant controversy; the mere exercise of a senior appropriation right gives one no ground to object. We, therefore, hold that the decrees in dispute here are final on these questions, and cannot thereafter be collaterally attacked after the time periods of the applicable statutes of limitation have expired.

██ We must next consider whether in the instant case the objector was entitled to show abandonment if he could by Granby of any of its storage rights. We believe he had that right. R.C.P. Colo. 99 provides that in a case involving an action to change the point of diversion of a water right, abandonment may be shown. If the particular situation involves reservoirs, an abandonment of the *storage rights* must be shown. *Del Norte Irrig. Dist., supra.* Two elements must be proved by an objector, viz., non-use of the storage rights and an intent to abandon the same. See *Farmers' Reservoir and Irrig. Co. v. Fulton Irrig. Ditch Co.,* 108 Colo. 482, 120 P.2d 196 (1941), where it is said that: "The question of

abandonment is one of intention. Non use (sic) alone is not sufficient." The elements must be proved by "clear and convincing" evidence. *Lengel v. Davis,* 141 Colo. 94, 347 P.2d 142 (1959); *Means v. Pratt,* 138 Colo. 214, 331 P.2d 805 (1958).

The question of intent may be established from the surrounding facts and circumstances. *Knapp v. Colorado River Water Conservation Dist.* 131 Colo. 42, 279 P.2d 420 (1955). A presumption of abandonment arises where it is shown by clear and convincing evidence that the rights involved remained unused for an unreasonable length of time, and where there is an absence of proof of some condition excusing such non-use. The owner's mere declaration of intent, without the facts showing a reasonable justification for non-use, will not overcome the presumption. *Knapp, supra.*

On the other hand, a reasonable justification for non-use may very well exist where it can be shown that economic, financial or legal difficulties or natural calamities prevented the storing of all the water that was originally decreed. *Flasche v. Westcolo Co.,* 112 Colo. 387, 149 P.2d 817 (1944); *Del Norte Irrig. Dist., supra.* In *Flasche* it was said:

"It would be a strange construction of the rule of law that gives them (the junior appropriators) a vested right to a continuance of conditions on the stream to hold that it is broad enough to vest them with the right to a continuance of the senior petitioner's misfortunes with their ditch; * * *. To deny petitioners, in the absence of abandonment, the right to repair and improve their old diversion system and take all the water that has been decreed to them would be a denial of their property rights."

As has been previously mentioned, the matter before us is complicated by the fact that the individual reservoirs were administered as if they were part of a single system. The evidence shows that in 1922, for some reason *more* water was stored in the reservoir system than

had been actually decreed to it, and that during some other periods, the system had delivered more water than was granted to all the storage facilities combined.

In the instant case the evidence showed, and the court so found, that financial difficulties, especially during the depression years, curtailed Granby's ability to keep the reservoirs in peak operating condition. The record discloses that petitioner was able to spend only $5,194 on the system from 1929 to 1936 (with some of the work at twenty-five cents an hour). The trial court also found that a shortage of materials and engineering help during the World War II years further hampered operations, and that all the Reservoirs had been used until 1945, except No. 3 (which stored only 8 a.f.), which had been washed out. In 1946, Reservoir No. 2's dam was intentionally breached because of a blockage due to a beaver dam. Repairs thereafter proved to be too expensive due to the stringent requirements placed thereon by U. S. Forestry officials. However, increasingly larger amounts were spent on the remaining system until 1961. It was shown that the change would avoid the greater expense of repairing and making usable again No's. 1, 2 and 3 Reservoirs and make for a more economical method of handling the system's water supply.

Suffice it to say that our reading of the record leads us to the conclusion that the trial court had ample evidence upon which to base its finding that there were insufficient facts to show by "clear and convincing" evidence that the petitioners intended to abandon any part of their decreed water. Further, there is ample evidence to sustain the decree changing the point of storage of No's. 1, 2 and 3 to the new 5 - 11 and 9.

We turn next to the problem as to whether the court erred in its finding that no injury would result from the plan as approved by it. As a corollary objection, the claim is made that the matter was not tried with an eye

to determine whether specific injuries would occur to this objector.

 Usually if a plan will not result in injury to the vested rights of the junior appropriators, or if they can be reasonably protected, the plan must be approved, for the right to change a place of use is "* * * an incident of ownership, and always enforceable so long as the vested rights of others are not injuriously affected." *Brighton Ditch Co. v. Englewood,* 124 Colo. 366, 237 P.2d 116 (1951); *Vogel v. Minnesota Canal and Reservoir Co.,* 47 Colo. 534, 107 Pac. 1108 (1910). When, however, the objector raises specific grounds of injury, the burden of proof rests upon the petitioner to meet those grounds. *Mannon v. Farmers' High Line Canal and Reservoir Co.,* 145 Colo. 379, 360 P.2d 417 (1961). *A fortiori,* by raising, as error, the ground that the court improperly found that no injury would result from the plan, the objector is including for our examination, all alleged injuries and their causes which he asserted during the trial.

 The burden that is placed upon the petitioner in this regard is to show that no substantial injury, as raised by the objector, will occur to the vested rights of the junior appropriator. Once it is shown that substantial injury could occur, the trial court has the affirmative duty to make inquiry into whether terms can be set which will forestall the injury. If such cannot be done, the petition must be dismissed. C.R.S. '53, 147-9-25; *Mannon, supra.* These requirements are not met by a petitioner who shows that the right that is to be changed is proportionately of a greater benefit to the senior than is the detriment to the junior, for the vested property rights of the junior appropriator include the right to have the conditions remain as they were when he obtained his appropriation. Such a junior right will be protected. *Farmers' High Line & Reservoir Co. v. Wolf,* 23 Colo. App. 570, 131 Pac. 291 (1913).

To substantiate his charge that he will be harmed by Granby's decreed new storage plan changing the time

of delivery of some of his water, Hallenbeck introduced evidence at the trial which essentially raised the following two conditions which, he asserts, if not resolved, will lead to his suffering substantial injury:

(1) Reservoir 9 is connected to the enlargement of 5 - 11 by a single pipe. He contended that the high water line in the enlargement is 5 feet above the invert of the connecting pipe and 2 feet above the high water line of Reservoir 9; that, therefore, water from the enlargement can, under the proper circumstances, run into Reservoir 9 from 5 - 11. He showed that Reservoir 9's watershed is very limited and that the watershed which supplies the enlargement of 5 - 11 is much larger. (We note, however, that his evidence [the Newkirk surveys] also shows a separate existing spillway for No. 9 which very well might prevent No. 9 from both retaining water longer than proper and which might prevent water flowing back into 5 - 11.) Therefore, he asserts, Reservoir 9 could, if the conditions were right, store water otherwise not available to it, and *affect the quantity of water available to him, as well as delaying its time of delivery.* He states that this could seriously injure him for he relies upon sufficient water being available for his farm around the 10th of May of each year. This is the time when his 700 acres of pasture land first require irrigation. Hallenbeck further asserts that,

(2) The watershed around Reservoirs 1, 2 and 3 is more limited than that around the enlargement. In addition, the snowfall, although heavier around the three upper reservoirs, melts at a slower rate and at a later time because of the higher elevation and the heavier timber growth. Therefore, he urges that to allow the decrees of No's. 1, 2 and 3 to be stored at a lower elevation in a larger watershed, where the drainage occurs at an earlier time, would again delay the delivery time and reduce the quantity of water available to him.

In dealing with this phase of the case the trial court made the following pertinent findings, based in part on

conflicting evidence before it, upon which it grounded its judgment allowing the change without limitation and in finding there would be no injury to Hallenbeck, viz:

(1) The transfer would reduce the total surface area of the Reservoirs involved by 45% (from a surface area of 106 acres to one of 69 acres) and this would diminish the evaporation loss accordingly.

(2) The time of run-off of the watersheds which supply Reservoirs 1, 2 and 3 is about the same as the watershed which supplies the enlargement of 5 - 11. Any difference in time of filling is compensated by the additional snowfall in the upper drainage area.

(3) There is sufficient room in the lower enlargement to store the waters decreed to Reservoirs 1, 2 and 3.

(4) By combining the decrees involved into one reservoir, the water will be administered more efficiently.

(5) The plan would "expedite the discharge of water from the places where stored into Dirty George Creek."

In our view, the reasons given by the trial court under (3) and (4) are advantages which accrue to the petitioner, and, are not reasons which can be used to counter an apparent substantial injury to a junior appropriator once such has been asserted. The fifth reason is one that can well be of value to both Granby and Hallenbeck, hence, it need not be considered further.

We are, therefore, concerned with findings (1) and (2), as to whether there is evidence to sustain them and whether they and the judgment satisfactorily cure the problems complained of sufficiently to allow the change of storage to be authorized. We hold that even though there is evidence of diminished evaporation loss and disputed evidence as to time of run-off and filling adequate to support those findings, nevertheless, for the reasons which hereinafter appear, there were not sufficient determinations made, nor safeguards adjudicated, adequately to protect the objector against the possible injuries he asserts as to quantity and interference with time of delivery.

In this regard, the evidence shows that this problem did not come into existence until after the 1960 enlargement of 5 - 11 had been completed. Mr. George Bowness, a seasonal deputy water commissioner for the area involved, testified that the watershed which supplies Reservoir 9 is very limited compared to the watershed servicing the enlargement. Mr. Merrill Flint, Granby's president, confirmed that the enlargement, without the use of Reservoir 9, is not big enough to hold all of the decrees adjudicated to Reservoirs 1, 2 and 3. In addition, he, as well as Mr. Loren D. Morrill, the petitioner's engineer, admits to the back-up possibility as previously described.

The record is silent as to how the petitioner intends to protect the objector against the possible injurious consequences that could arise from such a back-up of water into No. 9, an event that might hold up, or delay permanently, delivery of some of his water to him. In fact, it conceivably could prevent his getting some of his water at all. There is no evidence here as to the quantities of water affected nor times of the year involved. The court's finding that there would be a 45% evaporation loss reduction fails to inform us what this specifically means in terms of curing the possible injury. We do note, however, that objector's Exhibit No. 1 which is a survey map of the Reservoirs by Guy S. Newkirk, dated 1956, shows that the outlet to No. 9 was then 20.4' higher than the outlet to No. 11. The latter is the downstream discharge point for 5 - 11. Obviously, if the dam on No. 11 has not been raised more than 20.4' the water in 5 - 11 could not physically back up into No. 9, and probably no changes would arise as to that Reservoir and no damage could arise to the objector on that account.

On remand the trial court should, therefore, first determine the physical and engineering facts relating to the alleged possibility of a back-up into No. 9 and just how its separate spillway operates. Then if a back-

up could occur, unless a specific plan can be and is submitted by petitioner that will show the amounts and times involved and that no injury will occur as a result of the overflow running from the 5 - 11 enlargement into Reservoir 9, there is no alternative but to follow the suggestion made by Mr. Robert Robinson, the district's water commissioner, and eliminate Reservoir 9 from the plan. This could be done by either keeping the water level in the enlargement below the point where it can back into Reservoir No. 9 or by providing some method to close, at necessary times, the conduit between the two storage areas.

As to Hallenbeck's assertion that he might suffer injury due to the difference in the size of the original watershed of No's. 1, 2 and 3, as compared to the new larger one for 5 - 11 and 9, suffice it to say that the evidence thereon was conflicting, but since there is ample thereof to sustain the trial court's findings and judgment in this regard we will not interfere therewith. See *Boulder and White Rock Ditch and Reservoir Co. v. Boulder,* 157 Colo. 197, 402 P.2d 71 (1965).

Hallenbeck asserts, as his last specific ground for reversal, that it was error for the trial court not to have allowed him to attack the water rights attributable to Reservoir 10, which reservoir was found to be located where Reservoir 12 is shown on the map in 144 Colo. at p. 488. This claim is totally without merit. The record reveals that during the hearing on the motion for a new trial, the objector made the same claim and that the court responded as follows:

"If No. 12 is going to be thrown back into the case, then I am perfectly willing to consider a motion by the objector to that effect, if he files such a motion, but I want it definitely understood now that both parties, * * * will have an opportunity to prepare themselves as to the issue on Reservoir No. 12, which is now known as Reservoir No. 10, * * *."

The record fails to reveal that the objector filed any such motion or that one was ever filed by anyone. After having been given the opportunity by the trial court to pursue his request further in this action, the objector cannot now complain before this court when it appears that he failed to accept the trial court's offer then to reopen the matter. In any event, the status of No. 10 can be adjudicated, if necessary, at some other time in a different action.

▮ In conclusion, we find no merit to Hallenbeck's objection that the trial court erred in allowing Granby 3 years in which to repair Reservoirs 6 and 8, so as to enable them to carry their decreed water. Although we agree that such relief was not prayed for in the petition, the court had jurisdiction over the parties and the subject matter of the Granby Reservoirs and could hear the entire case. Its judgment was valid under the trial court's power to grant complete relief to the parties.

The judgment is affirmed as to the transferring of the storage rights of Reservoirs 1, 2 and 3 to Reservoirs 5 - 11, and is conditionally affirmed as to the transfer to No. 9 subject to a determination as to whether the objector could suffer an injury by virtue of the difficulties described herein relating to Reservoir No. 9 and the possible back-up and holding of water therein; and, if such injury could occur the trial court shall, after a hearing, issue such protective orders as are necessary for the benefit of the objector. If no adequate plan can be devised by petitioner to alleviate such injury, if one is found to exist, then the trial court shall order Granby to administer its water in 5 - 11 so as to avoid any inter-mingling of Reservoir 9's decree with other waters in 5 - 11 except for the outflow therefrom. And, in the latter event, the trial court shall then order that only so much of the water decreed to Reservoirs 1, 2 and 3 as can be held by the remaining enlargement made up of Reservoirs 5 *and* 11 may be diverted from No's. 1, 2

and 3, unless 5 - 11 can be further enlarged to hold the entire amount.

It is so ordered.

MR. JUSTICE FRANTZ and MR. JUSTICE SCHAUER not participating.