## No. 27436

**In the Matter of the Application for Water Rights of John E. Orr, in Weld County, Colorado v. City and County of Denver, acting by and through its Board of Water Commissioners, Weldon Valley Ditch Company, and The Irrigationists Assoc.**

(572 P.2d 805)

Decided October 3, 1977. Rehearing denied October 24, 1977. Rehearing stricken January 30, 1978.

Alvin L. Steinmark, for applicant-appellee.

Michael L. Walker, for protestant-appellant City and County of Denver.

Glenn G. Saunders, for protestant-appellant Weldon Valley Ditch Company.

Donald F. McClary, for protestant-appellant Irrigationists Association.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

The water court granted the applicant's application for underground water rights and the use of well water as alternate points of diversion for the applicant's decreed surface water. The protestants objected there and here on the grounds that the rights represented by the applicant's surface decrees had been abandoned in whole or in substantial part, and that the change in points of diversion requested by the applicants would cause substantial injury to junior appropriators. The protestants further urged here that some of the applicant's claimed underground water rights are not subject to adjudication because of failure of the applicant to prove acts necessary to constitute an appropriation. We do not consider this last mentioned assignment as it was not presented to the water court. We affirm.

The key issue in this case is whether there was an intent on the part of the applicant's predecessors in title to abandon any of the decreed surface water. This is largely a "fact" question. If there was evidence to support the water court's finding that there was no intent to abandon, we must affirm. There was evidence to support the trial court's finding.

This case concerns the decreed rights to the Corona Ranch Ditch. The applicant is the owner of two ranches, which are adjacent to the south bank of the South Platte River. The westernmost of these is the Eagles Nest Ranch, consisting of 4300 acres. Immediately to the east of it is the Lost Creek Ranch, containing 1720 acres. In addition the applicant holds two sections of state land under lease.

The headgate of the Corona Ranch Ditch is on the South Platte River in the northwest portion of the Eagles Nest Ranch. The Corona Ranch Ditch proceeds about three miles through that ranch to the Lost Creek Ranch. Except in times of high water, the headgate of the ditch is above the flow of the river. It is apparent from the provisions of the decree, that by July 10th of each year the river was lower than the headgate, with resultant inability to divert river water into the ditch at that point.

On November 21, 1895 the Weld County District Court entered a decree, granting two priorities to the ditch. The first was Priority No. 10 with priority date of June 1, 1875 for 21 cubic feet of water per second of time (c.f.s.) between April 10th and July 10th of each year. The second was Priority No. 31 for 35 c.f.s. The decree stated as to Priority No. 10,

"By water on meadows." It described Priority No. 31 as "By Construction." It follows that under Priority No. 10 the water flowed in the ditch rather naturally, with little construction required. Also, in order for there to be Priority No. 31, it is apparent that the ditch was enlarged by construction.

The record shows that for extended periods of time there was non-use or only partial use of the upper portion of the ditch. One witness testified that a number of years ago a bridge was constructed across the ditch at a point approximately a mile below the headgate. According to this witness only six c.f.s. can pass under this bridge.

The ditch runs parallel to, and at a lower level than, the Bijou Canal and the Empire Intake Canal. Water from these canals historically has seeped into, and formed a part of the flow of, the Corona Ranch Ditch. Also, seepage from the two canals, as well as from the river, furnished subirrigation to the applicant's land.

There are two water wells on the Lost Creek Ranch which were decreed in 1974 with priority dates of December 31, 1944, and June 6, 1951 for 3.89 c.f.s. and 4.36 c.f.s., respectively. The applicant obtained in this proceeding a conditional decree for four more wells in the aggregate amount 9.78 c.f.s.

In 1974 the applicant entered into a contract with the Bijou Irrigation Company for transportation of water decreed to the Corona Ranch Ditch through the Bijou Canal.

Testimony was presented on behalf of the applicant to the effect that through the years the applicant and his predecessors in title had used the seepage water and well water as alternate sources of supply for the Corona Ranch Ditch decrees.

In its decree, the water court stated:
"That the Objectors have failed to show by any evidence that the water rights in and to the Corona Ranch Ditch have been abandoned. On the contrary, the evidence shows a clear use of the waters in and to the Corona Ranch Ditch by the Applicant and his predecessors, and there is no evidence of any intention to abandon said water rights."

In support of this finding, the court mentioned the following matters:
1. The Corona Ranch Ditch historically has irrigated 1200 acres of land as shown by the records of the State Engineer and by testimony presented at the trial.
2. The waters in the ditch have been continually used since its construction, and the owners of the land have further used the two existing irrigation wells and seep waters as alternative sources of diversion.[1]

---

[1]The court added that section 37-92-301(3)(d), C.R.S. 1973 provides that in authorizing alternate points of diversion for wells the court should exercise the widest possible discretion to permit such use.

The court concluded:

"The water rights in and to the Corona Ranch Ditch have not been abandoned. In order to show an abandonment of a water right, the burden of proof is upon the Objectors to show by clear and convincing evidence that the water rights in and to the Corona Ranch Ditch have not been used for a long period of time, and that the non-use is coupled with an intent to abandon. [citations]

"Intention may be shown either expressly or by implication. Evidence of non-use is not conclusive, and merely establishes a prima facie case. [citations]"[2]

* * * *

"Applicant shall be entitled to the use of priority number 10 for 21 c.f.s. with an appropriation date of June 1, 1875, only between the dates of April 10 and July 10 of each year in accordance with the Decree of the Weld County District Court in Cases numbered 433 and 2142 dated November 21, 1895. . . . Applicant shall be entitled to the use of priority number 31 for 35 c.f.s. with an appropriation date of November 15, 1886 only at such times as said water right is in priority. If said surface rights are used by Applicant as alternate points of diversion for his wells, said wells may operate only at such times as said Decrees are in priority. At all other times the hereinafter described wells of Applicant shall be subject to administration and regulation by the Office of the State Engineer, State of Colorado."

The findings, conclusions and decree are supported by competent evidence.

The water court granted conditional decrees for the four additional wells as prayed by the applicant. It ruled that all six wells might be used as alternate points of diversion of the Corona Ranch Ditch to the extent of the capacity of the wells; and that applicant should cease diverting directly from the river an amount equal to that pumped from his wells, being a total of 18.03 c.f.s.

The protestants have argued that the change permitted by the court will greatly enlarge the burden on the river to the injury of junior appropriators. In contrast, the water court ruled that, if the surface decrees to the ditch are reduced proportionately by the amount of water pumped from applicant's wells, there will be no injury to vested rights; and that in fact the river will be benefited.

---

[2]The court cited *Upper Harmony Ditch Co. v. Carwin,* 189 Colo. 190, 539 P.2d 1282 (1975); *Means v. Pratt,* 138 Colo. 214, 331 P.2d 805 (1958); *Pouchoulou v. Heath,* 137 Colo. 462, 326 P.2d 656 (1958); *Cline v. McDowell,* 132 Colo. 37, 284 P.2d 1056 (1955); *Fruitgrowers Ditch and Reservoir Co. v. Donald,* 96 Colo. 264, 41 P.2d 516 (1935); *Arnold v. Roup,* 61 Colo. 316, 157 P. 206 (1916); *Parsons v. Fort Morgan Reservoir & Irrigation Co.,* 56 Colo. 146, 136 P. 1024 (1913); *White v. Nuckolls,* 49 Colo. 170, 112 P. 329 (1910); and *Platte Valley Irrigation Co. v. Central Trust Co.,* 32 Colo. 102, 75 P. 391 (1903).

Since our affirmance of the court's finding of no abandonment means that the applicant could enforce his rights under the decrees at the headgate, it is obvious that using water from the wells in lieu thereof would leave more water in the river and thus aid, rather than injure, junior appropriators.

Judgment affirmed.

MR. JUSTICE ERICKSON concurs in part and dissents in part.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE KELLEY dissent.

MR. JUSTICE ERICKSON specially concurring in part and dissenting in part:

I respectfully concur in part and dissent in part to the majority's opinion. Although I concur in the majority's affirmance of the trial court's finding of nonabandonment, I cannot concur in the court's analysis. More importantly, I believe the majority has inadequately addressed and incorrectly decided the issue of whether other appropriators will be injured by the change of point of diversion authorized by the trial court.

I.

The majority affirmed the trial court's finding of nonabandonment on the ground that seepage from the Bijou and Empire Canals and water from two wells were the equivalent of water taken from alternate points of diversion. I concur in the result, but not in the majority's analysis.

The elements of abandonment are well established in Colorado water law. This court in *Upper Harmony Ditch Company v. Carwin*, 189 Colo. 190, 539 P.2d 1282 (1975), restated the general principles:

"We repeat familiar statements as to the law of abandonment. It must be proven by evidence of non-use and intention to abandon. Intention may be shown either expressly or by implication. Non-use for a long period of time is evidence of intention to abandon. It is not conclusive and merely establishes a prima facie case, and the presumption established by non-use can be rebutted. *South Boulder Co. v. Davidson*, 87 Colo. 391, 288 P. 177 (1930), and *Sieber v. Frink*, 7 Colo. 148, 2 P. 901 (1883)."

The presumption that is established by non-use can be rebutted by acts, conditions, or circumstances that show reasonable justification for non-use. *Hallenbeck v. Granby Ditch and Reservoir Company*, 160 Colo. 555, 420 P.2d 419 (1966).

The record in this case establishes that no diversions were made through the decreed headgate for the 26-year-period between 1948 and 1974. Non-use for 26 years gives rise to the presumption of an intention to abandon the water rights. *Upper Harmony Ditch Company v. Carwin, supra.*

The record in this case includes certified copies of the water commissioner's field book entries for the Corona Ranch Ditch. Among the entries made during the 26-year-period were: "No water demanded — Account seepage"; "No water demand. Used some Bijou water"; "Not much water used on account of flood and seepage"; "No water used except pumps on account of spring flood." Accompanying these notations were routine entries that 1200 acres had been irrigated in each given year.

The testimony established the following facts: (1) water ran in the ditch, although not as a result of diversions from the South Platte River; (2) this water was seepage from the Bijou and Empire Canals; (3) the South Platte River subirrigated part of the applicant's lands; and (4) "good crops" were grown and harvested from the irrigated lands.

It seems clear that the water under these decrees was not diverted by the applicant or his predecessors because the purpose of the original appropriation, namely, the irrigation of certain lands, was achieved by the waters received from the other sources. The decreed water was, therefore, not needed to fulfill the purpose of the original appropriation under the circumstances. In *New Mercer Ditch Company v. Armstrong*, 21 Colo. 357, 40 P. 989 (1895), this court stated:

"[B]oth the law under which this decree was rendered, and the decree itself, contemplates that no claimant shall be entitled to the use of a quantity of water in excess of that actually needed for the purpose for which the appropriation was made. . . . He claims that, by reason of seepage water coming upon his bottom land, he did not need any water direct from the stream from 1882 to 1884; and we think it is true that, as to this quantity of water, found by the referee to have been necessary to irrigate his farm, and which had been thus used, there was no waiver of Yeager's rights thereto by this, or any other, act of his. . . ."

The legislature has also recognized that if water is not needed for the purpose of the appropriation, the appropriator cannot be charged with the intent to abandon. Section 37-92-402(2)(j), C.R.S. 1973.

Testimony also supports this analysis. First, none of the applicant's predecessors in interest testified that the seepage, subirrigation, and wells were used as alternate points of diversion. And second, one predecessor gave the following testimony:

"Q. Did you ever consider that the water rights might be abandoned in the Corona Ranch Ditch?

"A. Oh, no, because we were sole owners of them. Why would you abandon them? What if you hit a drought? You need them."

The implication is that if the subirrigation and seepage had ceased, the applicant would have resumed diversions under his decrees to the extent necessary to irrigate the acreage contemplated therein. While self-serving statements of interested parties as to their intent alone are insufficient to establish the absence of intent to abandon, *Knapp v. Colorado River*

*Water Conservation District*, 131 Colo. 42, 279 P.2d 420 (1955), this testimony is consistent with other evidence in the record.

Since the decreed water rights were not needed to achieve the purpose of the original appropriation, the presumed intent to abandon that arises from non-use is rebutted. The lack of need under these circumstances is reasonable justification for non-use of the decreed rights.

## II.

The second issue in this case is whether injury to other vested rights would result from the proposed change in point of diversion.

The water application included a request that six wells be permitted to serve as alternate points of diversion for 18.03 c.f.s of the Corona Ranch Ditch decrees. The total acreage that would be irrigated by the wells would be 590 acres. This acreage is either beyond the reach of the Corona Ranch Ditch or is above it on bench land. Thus, none of the land that will be irrigated by the wells has been historically irrigated and is not capable of being irrigated by the Corona Ranch Ditch.

The appellants alleged in their statements of opposition that the proposed change in points of diversion would result in an enlarged use and injury to their rights.

The general rule in Colorado is that a water right is a property right and may be sold and transferred separately from the land where it ripened, and that an appropriator may change the point of diversion or place of use, or character of use, without losing his priority, provided the rights of others are not thereby injured. *Fort Lyon Canal Company v. Chew*, 33 Colo. 392, 81 P. 37 (1905). The applicant has the burden of showing the absence of any injurious effect which is alleged in a protest or statement of opposition. Section 37-92-304(3), C.R.S. 1973; *Enlarged Southside Irrigation Ditch Company v. John's Flood Ditch Company*, 116 Colo. 580, 183 P.2d 552 (1947).

The law in Colorado is also that a water appropriation is made for use on a specific tract of land. The acreage brought under irrigation is the principle basis of measurement in the adjudication of priorities, and use on increased acreage of necessity is evidence, although rebuttable, of increased use either in volume or time. *Enlarged Southside Irrigation Ditch Company v. John's Flood Ditch Company, supra.*

The relationship between the water decree and the lands to be irrigated under the original appropriation was discussed in terms of injury from a proposed change in point of diversion in *Farmers Highline Canal and Reservoir Company v. City of Golden*, 129 Colo. 575, 272 P.2d 629 (1954).

"Although the expression 'Duty of Water,' in the opinions of some present-day scholarly hydrologists and technical engineers, may be outmoded, provincial, unscientific, and otherwise objectionable, nevertheless it is a term well understood and accepted by every rancher and farmer who has

had practical experience in the artificial irrigation of land for the production of crops. It is that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. . . . Where the entire amount fixed by the decree was reasonably required in the proper irrigation of the lands to which first applied, then the whole priority properly may be changed for similar usage; but where such irrigation did not require the entire volume of the decree, then only that portion may be changed which previously had been necessary for proper irrigation. It is not a question of whether the amount of water decreed was adequate, but whether it was excessive. The extent of needed use in original location is the criterion in considering change of point of diversion. This, of course, is premised upon the assumption that whatever of the decreed water was not properly used remained in the stream.

"In addition to the duty of water in change of point of diversion cases, due consideration also must be had with the amount of return flow, both before and after the change, that the stream may remain as it was, and not suffer depletion, nor yet that the user at the point of changed location be obliged to add thereto. The first is not permissible and the latter not required."

The question presented in this case is whether injury will result if an appropriator with a valid decreed appropriation, the purpose of which is satisfied by substantial seepage and subirrigation, is permitted to change his point of diversion and thereby his place of use. The majority opinion affirmed the trial court's conclusion:

"The protestants have argued that the change permitted by the court will greatly enlarge the burden on the river to the injury of junior appropriators. In contrast, the water court ruled that, if the surface decrees to the ditch are reduced proportionately by the amount of water pumped from applicant's wells, there will be no injury to vested rights; and in fact the river will be benefited."

I disagree.

The finding of nonabandonment in Part I was premised on the fact that under the circumstances the appropriator did not need the water to achieve the purpose of the appropriation. But the burden of his appropriation was, nonetheless, realized by the stream system. Were we to permit the appropriator to change his point of diversion and thereby the place of use in the manner sought, an enlarged use would result, the amount of return flow would be reduced, and other water rights would be injuriously affected.

As noted above, the trial court granted the change but ordered the applicant to cease diverting directly from the river in an amount equal to that pumped from his wells. While such a condition is usually adequate to

protect other appropriators in a change of point of diversion proceeding, it is inadequate in this case. In the usual case, the appropriator is able to regulate the extent of his diversions from a given source, or to "dry up" certain lands to shift the burden of his water usage. The appropriator who relies upon subirrigation or seepage is unable to do so.

The applicant in this case presently utilizes water that comes upon his lands through subirrigation and seepage. Neither he nor his predecessors have made a diversion from the decreed headgate in 26 years. It is obvious that the court's order that the applicant cease diversions proportionally will have little meaning, since the applicant has no control over seepage or subirrigation. The effect of the majority's opinion is to permit the applicant to use his decreed water rights to irrigate 590 acres of new land, while the burden of his present water use continues. The applicant, therefore, will receive a double benefit and impose a double burden on the stream to the detriment of other decreed appropriators.

I would, therefore, deny the application for a change in points of diversion on the basis that the proposed change cannot be effected without injuring the rights of other decreed appropriators. Since the seepage and subirrigation appropriator is unable to "dry up" historically irrigated lands or cease his diversions, no terms or conditions can be imposed to prevent injury. To permit such an appropriator to change the point of diversion and place of use of his decreed right is in effect to grant a new water right with the same priority as the earlier decree.

MR. CHIEF JUSTICE PRINGLE dissenting:

I respectfully dissent. I think the court committed error in failing to find abandonment as to all or part of the water.

MR. JUSTICE KELLEY joins in this dissent.