## No. 27421

**In the Matter of the Application for Change of Water Rights of the Twin Lakes Reservoir and Canal Company in the Roaring Fork River and its Tributaries, in Pitkin County, Colorado. The Twin Lakes Reservoir and Canal Company v. The City of Aspen, the Board of County Commissioners of the County of Pitkin and the Snowmass Water and Sanitation District**

(568 P.2d 45)

Decided August 22, 1977.                    Rehearing denied September 12, 1977.

Holland and Hart, John Undem Carlson, John H. Land, Lawrence L. Fenton, Louis Johnson, William F. Mattoon, Leland M. Coulter, for applicant-appellee.

Vranesh and Musick, John D. Musick, Jr., Joseph A. Cope, Sandra Stuller, City Attorney, Robert Grueter, Richard J. Wood, County Attorney, for objectors-appellants.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

The water court entered a decree permitting The Twin Lakes Reservoir and Canal Company (here called the Company) to change the nature of use of water rights from direct flow and storage for irrigation purposes to direct flow and storage for irrigation, domestic, commercial, industrial, municipal and all beneficial purposes. The City of Aspen, the Board of County Commissioners of Pitkin County and the Snowmass Water and Sanitation District took this appeal. We affirm.

The record in this case contains 3741 folios. The exhibits fill a fair-sized carton. The water court's findings of fact, conclusions of law and decree consist of 80 folios. Our reading of the record and exhibits, as well as study of the briefs, convinces us that the findings, conclusions and decree are correct, and a substantial part of this opinion is predicated upon them.

The water system of the Company has been devoted to the irrigation of 56,000 acres[1] underlying its Colorado Canal in the Ordway-Rocky Ford area, which is located in the southeastern quarter of Colorado. The sources of its water are (1) direct flow from the Arkansas River, (2) storage in Twin Lakes Reservoir and (3) the Independence Pass Transmountain Diversion System (called "IPTDS"). Prior to 1935 its sources were limited to (1) and (2) just set forth.

We quote from the water court's findings:

"In 1933, R. J. Tipton, a well known hydrologist and engineer, concluded after a detailed study that all Arkansas River basin sources available to the Twin Lakes Company produced only 69,000 a.f. per annum, mean diversions, from 1912 to 1932, and that the mean annual shortage in water supply for the Project Lands from 1912 to 1932 was 56,300 a.f. measured at the headgate of the Colorado Canal. To obtain 56,300 a.f. at the Colorado Canal, the Twin Lakes Company must release approximately 63,000 a.f. from Twin Lakes Reservoir, for there is an 11.33% transmission loss from the reservoir to the headgate."

---

[1] In recent years 50,000 acres have been so irrigated.

This and other factors caused the Company to proceed with IPTDS, a preliminary survey concerning which had been made in 1930. The cost of IPTDS has been over $4,250,000.

The Arkansas River flows eastward from the Continental Divide. Twin Lakes Reservoir, at high elevation, is an "in-creek" reservoir on Lake Creek, one of the river's tributaries. The IPTDS is an integrated, complex system of canals, collection works and tunnels on the western side of the Continental Divide. There, water is collected from various streams comprising the headwaters of the Roaring Fork River, which is tributary to the Colorado River.[2] This collected water is diverted through a tunnel beneath the Continental Divide to the headwaters of Lake Creek, and from thence in the creek to Twin Lakes Reservoir.

In 1936 the district court entered a decree in the adjudication of the IPTDS water. All priorities there decreed, both absolute and conditional, were given a priority date of August 23, 1930. Conditional priorities were awarded to each of the component parts of the IPTDS gathering system. These priorities were in the aggregate amount of 716 cubic feet per second of time (c.f.s.). *Twin Lakes Reservoir & Canal Co. v. City of Aspen*, 192 Colo. 209, 557 P.2d 825 (1976). The court further found that the ultimate capacity of the transmountain diversion tunnel would be 625 c.f.s. It awarded the tunnel an absolute priority for 367 c.f.s. and a conditional priority of 258 c.f.s. Portions of the decree read as follows:

"That the total amount of water which said system shall be entitled to divert from all sources at any one time shall be limited to the carrying capacity of Tunnel Number 1 when completed, said carrying capacity being estimated at 625 cubic feet of water per second of time; and, further, that the water so diverted is to be *supplementary* to the decreed rights of the claimant The Twin Lakes Reservoir and Canal Company, out of the Arkansas River and its tributaries, and is to be allowed to flow only when the decreed rights of said claimant for storage in the Twin Lakes Reservoir and for direct irrigation are not supplied from its *existing sources of supply*." (Emphasis added.)

* * * *

"That the said Twin Lakes Reservoir and Canal Company, its successors in interest or the parties lawfully entitled thereto, shall also be entitled to store the water so diverted through said system for irrigation purposes when said water is not being used for direct irrigation purposes, in such amount as may be necessary, with the quantity of water which may be derived from other decrees and from other sources of supply, to fill the Twin

---

[2]For a more complete description of the gathering system, see *Twin Lakes Reservoir & Canal Co. v. City of Aspen*, 192 Colo. 209, 557 P.2d 825 (1976).

Lakes Reservoir to its capacity of 54,452 acre-feet of water once each year, with priority right relating to and dating back to August 23rd, 1930."

The "existing sources of supply" of the Company, to which the IPTDS water is "supplementary" as decreed above, are the following:

"(a) 756.28 c.f.s. decreed from the Arkansas River to the Colorado Canal for direct irrigation purposes by decree dated March 23, 1896, and with priority date of June 9, 1890.

"(b) Reservoir priority No. 3 for storage of 20,645.3 a.f. of water decreed from Lake Creek for storage in Twin Lakes Reservoir by decree dated July 14, 1913, and with priority date of December 15, 1896.

"(c) Reservoir priority No. 4 for storage of 33,806.70 a.f. of water decreed from Lake Creek for storage in Twin Lakes Reservoir by decree dated July 14, 1913, and with priority date of March 29, 1897."

Thus, the company has decrees from eastern slope sources for direct flow of 756.28 c.f.s. and for Twin Lakes Reservoir storage of 54,452 acre feet.

Through the years the Company has improved the IPTDS in order to obtain greater amounts of water. These improvements included plastic lining in the collection canals and later spreading bentonite therein to minimize seepage losses. Subsequently, it installed corrugated metal pipe in the most porous portions of the canals. In 1971 and 1972 it lined the trans-mountain diversion tunnel with concrete. The result of these efforts is that 610 c.f.s. will now pass through the tunnel.[3] Periodically, the district court and later the water court made findings that the Company was proceeding with diligence to enlarge the amounts carried under its conditional decrees, and increased the amount absolutely decreed to the tunnel. In 1973, 610 c.f.s. was decreed absolutely to the tunnel, with the remaining 15 c.f.s. remaining under the conditional decree.

Six municipalities and one quasi-municipal corporation have now acquired about 65% of the capital stock of the Company. These are the cities of Colorado Springs, Aurora and Pueblo, the towns of Ordway, Sugar City and Olney Springs, and the Pueblo West Metropolitan District. They seek to utilize the water derived from IPTDS in their municipal systems. The Company, therefore, filed the application for change of use which is here involved.

The Colorado River Water Conservation District entered its objection before the water court. This was withdrawn after it entered into a stipulation with the Company whereunder IPTDS diversions are to be limited to 570,000 acre-feet over any period of 10 years with a maximum annual

---

[3]It is thought that the sustained carriage of water through the tunnel in the future will cause the walls thereof to "slicken" and eventually allow carriage of an instantaneous flow of 625 c.f.s.

diversion of 68,000 acre-feet. The stipulation contains this provision:

"In determining the allowable diversion in acre feet by Twin Lakes in a current year, there shall be subtracted from 570,000 the sum of the Twin Lakes diversions of the previous nine years . . . and the remainder shall constitute the permissible total diversion for the current year. . . ."

As already mentioned, the water court entered a decree permitting the change of use from irrigation to irrigation, domestic, commercial, industrial, municipal and all beneficial uses. In the decree it incorporated the provisions of the stipulation. It found that, as the municipalities begin using the IPTDS water, this will necessitate a change in irrigation practices under which land formerly irrigated for row crops will have to be irrigated merely as pasture lands.

The appellants have set forth the summary of their arguments as follows:

"I. The right to change the use of an absolute water right is limited by the extent of its use before the change.

"II. The right to change the use of a conditional water right is limited by the extent of its use before the change, insofar as the conditional aspects have been completed, and by the extent of its use contemplated at the time of the original appropriation, that which would have resulted if completed and used as intended at the time of the original appropriation, insofar as the conditional aspects have not been completed.

"III. The extent of use of the IPTDS contemplated at the time of the original appropriation is reflected by its historic use."

\* \* \* \*

"IV. The terms and conditions imposed with the water court do not adequately protect other appropriators and users of water rights from injury."

Following a recitation of the factual and background situation, the water court prefaced its findings and conclusions by quoting certain statutes. These are from the Colorado Revised Statutes 1973, as follows:

"'Change of water right' means a change in the type, place, or time of use, a change in the point of diversion to alternate or supplemental points of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate places of storage to a fixed place of storage, or any combination of such changes. *The term 'change of water right' includes changes of conditional water rights as well as changes of water rights.*" (Emphasis added.) 37-92-103(5)

"A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a

vested water right or a decreed conditional water right. If it is determined that the proposed change or plan as presented in the application would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect." 37-92-305(3)

"Terms and conditions to prevent injury as specified in subsection (3) of this section may include: .

"(a) A limitation on the use of the water which is subject to the change, taking into consideration the historic use and the flexibility required by annual climatic differences;

"(b) The relinquishment of part of the decree for which the change is sought or the relinquishment of other decrees owned by the applicant which are used by the applicant in conjunction with the decree for which the change has been requested, if necessary to prevent an enlargement upon the historic use or diminution of return flow to the detriment of other appropriators;

"(c) A time limitation on the diversion of water for which the change is sought in terms of months per year;

"(d) Such other conditions as may be necessary to protect the vested rights of others." 37-92-305(4)

The water court then considered the argument that the Company has historically operated its IPTDS in such a manner as to establish a pattern of bypassing water otherwise available for diversion, thus creating an availability of water in the Roaring Fork River on which appellants have come to rely. This argument was supported by testimony that on occasion the Company did not take all of the IPTDS water to which it was entitled. The water court found that the long, continued improvement of the system by the Company negated the contention that the Company had established a pattern of bypassing water otherwise available. The court concluded that the Company had not slept on its rights in a manner that would justify any reduction in entitlement and in change of use.

The water court then addressed itself to the question of draft on the stream contemplated at the time of the original appropriation. It cited *Farmers Highline Canal & Res. Co. v. Golden*, 129 Colo. 575, 272 P.2d 629 (1954), for the proposition that, "[t]he extent of needed use in the original location is the criterion on considering change of point of diversion." The court then stated:

"The draft on the stream contemplated in 1936 for the IPTDS is therefore measured in relation to the needs of the Project Lands. The uncontradicted evidence in this case establishes that the Project Lands continue to experience a shortage of water in amounts at least equal and probably greater than that established by Tipton in 1932. The shortage on Project Lands is of course variable, according to the water supply experienced in

the Arkansas drainage. In years of extreme drouth, for example, 1954, the Arkansas sources of supply furnished only 10,000 a.f. of water towards a total annual irrigation need (excluding provision for storage) of at least 125,000 a.f. By contrast, in the rare years of bountiful water supply, such as 1965, the Arkansas sources yielded 135,862 a.f., of which a portion was stored for later use.

"The extreme variability of supply on the Arkansas System vastly enhances the value of Twin Lakes Reservoir, for it captures water in years of full supply for use in a later season or later year when supply is scant.

"Since the contemplated draft of the original appropriation ranged from 40,000 to 80,000 a.f. per annum, and since the actual need for IPTDS water existed, and still exists, on the Project Lands greater than 60,000 a.f. (measured at Twin Lakes Reservoir), it is clear that the change decree sought by the Twin Lakes Company does not involve an expanded use over that contemplated in 1936. Accordingly, the court concludes that the change sought does not amount to an enlarged use over the original appropriation."

The water court disposed of the "historical average" argument as follows:

"The Objectors' argument for imposition of a historical average on the change of use rests on the proposition that the Twin Lakes Company in practice did not attempt to fully utilize the absolute portions of its decree. Since the decree was in significant aspects conditional throughout the period which Objectors use for their average of diversions, and since during that period the Company was attempting to make absolute that conditional decree, the application of a historical average is uncalled for, and if applied, would lead to grossly unfair results. It would deny the Company the benefits of the collection system improvements as well as the tunnel lining project. By statute the legislature has ordained that a conditional water right may be the subject of a change in use. Imposition of a historical average would utterly negate what the legislature has clearly granted."

As to the appellants' claim that they will be injured by the decree, the water court found that the diligence proceedings throughout the years constituted notice to all junior appropriators that the conditional components of the IPTDS were being completed and that the company was proceeding to obtain the contemplated draft of 1936. It added:

"Attainment of that draft is what the Objectors here complain of; however, perfection of a conditional right according to its originally contemplated draft is not injury as the law knows it; rather, it is the exercise of a senior priority."

In the consideration of change of points of diversion and of use, we are accustomed generally to situations in which the water remains in the same watershed. In such cases, two of the primary factors to be considered are any change in the consumptive use of the water and any change in return flow to the stream from irrigation. In contrast, once the IPTDS

water flows .into the transmountain diversion tunnel, so far as Western Slope users are concerned, there is a 100% consumptive use.

■ Actually, there is a single issue here: Will the appellants and others holding junior priorities be injured because more IPTDS water will go through the tunnel and be lost to Western Colorado under the municipal use than would be the case in the future without the change of use? We approve the court's conclusion in the negative.

It should be borne in mind that the municipalities who are going to use this water do not have a right to a steady flow of IPTDS water. Rather, they are subject to the same limitation as the Company has been in the past of the right to use IPTDS water only as supplementary to the Company's decrees from the Arkansas River and Twin Lakes Reservoir. In other words, the Company (which includes its municipal stockholders) can use IPTDS water only to the extent that there is a shortage under the Company's decrees to Eastern Slope water.

■ To us, a very important factor in this proceeding is the stipulated and decreed volumetric limitation operating annually and on a ten-year running average. The water court found that these volumetric limitations constitute a reduction from the contemplated draft of the original appropriation. The evidence sufficiently supports this conclusion with the result that the change of use is not improper.

Judgment affirmed.