859 P.2d 1348 (1993)
The CITY OF THORNTON, Objector-Appellant,
v.
CLEAR CREEK WATER USERS ALLIANCE, Applicant-Appellee,
The Lower South Platte Water Conservancy District, The City of Westminster, the City of Golden, the City of Northglenn and the State Engineer and the Division Engineer, Water Division No. 1, Objectors-Appellees.
No. 92SA410.
Supreme Court of Colorado, En Banc.
September 27, 1993.
Lind, Lawrence & Ottenhoff, Kim R. Lawrence, Greeley, for objector-appellee Lower South Platte Water Conservancy Dist.
Carlson, Hammond & Paddock, Mary Mead Hammond, William A. Paddock, Denver, for objector-appellee City of Westminster.
Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Jennifer L. Gimbel, First Asst. Atty. Gen., Natural Resources Section, for objector-appellee State Engineer and Div. Engineer for Water Div. No. 1.
*1349 White & Jankowski, Michael D. White, David C. Taussig, Scotty P. Krob, Denver, for objector-appellant City of Thornton.
Saunders, Snyder, Ross & Dickson, P.C., Jefferson V. Houpt, David C. Hallford, Denver, for applicant-appellee Clear Creek Water Users Alliance.
Justice VOLLACK delivered the Opinion of the Court.
The City of Thornton appeals from a water court ruling granting the Clear Creek Water Users Alliance's application for alternate places of storage for a previously decreed conditional right to store 110,000 acre-feet of water. The Alliance received a decree in 1983 to store 110,000 acre-feet of water in a proposed reservoir, the Clear Creek Reservoir, located near the confluence of Clear Creek and North Clear Creek in upper Clear Creek Basin. The Alliance subsequently filed an application to change its conditional right by adding five additional proposed storage sites to its conditional right to store 110,000 acre-feet of water. The City of Thornton, among others, objected to the application. The water court entered a decree granting the Alliance's application. The City of Thornton appealed, contending that permitting the Alliance to store water in the five alternate sites impermissibly injured its water rights. We affirm the ruling of the water court.

I.
In March 1980, several entities formed a non-profit corporation named the Clear Creek Water Users Alliance (the Alliance).[1] The purpose of the Alliance was to "safeguard the water supply of the Clear Creek Basin."
On December 15, 1981, Woodward-Clyde Consultants (Woodward-Clyde) submitted a report to the Alliance containing the results of an investigation exploring possible reservoir sites in Clear Creek Basin. Woodward-Clyde stated that the objectives of its "investigation included: (1) estimating the streamflows in Clear Creek that would be available for storage under a 1981 priority at the proposed `Forks Reservoir' site, and (2) assessing the water supply that could be developed by a reservoir at that site." The report stated that the Forks Reservoir "would be formed by a dam constructed on Clear Creek upstream from Golden at a site a short distance downstream from the confluence of North Clear Creek with Clear Creek," tributaries of the South Platte River.
The report noted that, at the Forks Reservoir site, "Clear Creek drains an area of about 350 square miles, or about 60 percent of the total drainage area of Clear Creek (about 580 square miles)." The Woodward-Clyde report additionally stated,
According to a 1968 filing in the Colorado State Engineer's Office, the proposed Forks Reservoir could be constructed to a total capacity of about 400,000 acre-feet. A reservoir of this capacity would inundate a portion of Interstate Highway 70, probably making it economically unfeasible. According to preliminary analyses ..., a reservoir at this site could impound up to 87,000 acre-feet without inundating the interstate highway. However, it would inundate portions of U.S. Highway 6 and State Highway 119 in the canyons of North Clear Creek and Clear Creek.
The report concluded that "construction of a reservoir in the Clear Creek basin would offer substantial opportunities to improve management of the limited water supplies in Clear Creek." The report recommended that the Alliance apply for a water storage right on Clear Creek.
On December 31, 1981, the Alliance filed an application for a conditional right to *1350 store 110,000 acre-feet of water in Clear Creek Reservoir, a proposed reservoir to be constructed near the confluence of Clear Creek and North Clear Creek. The City of Thornton, among others, objected to the Alliance's application for a conditional right. On October 20, 1983, the water court entered a decree granting the Alliance a conditional right to store 110,000 acre-feet of water in the proposed Clear Creek Reservoir, which the decree stated as having a capacity to hold 110,000 acre-feet of water.[2]
The Alliance subsequently submitted a request for a feasibility study to the Colorado Water Resources and Power Development Authority (the Authority). In November 1987, the Authority issued a report of Phase I (the Phase I report) of the feasibility study for the Clear Creek project.[3] The Phase I report stated that its primary objective was "to estimate the reservoir yields and associated preliminary costs for each alternative identified."
The Phase I report stated that the Clear Creek basin
is bordered by the Continental Divide to the west and the confluence of Clear Creek and the South Platte River in Denver to the east. The mountainous upper basin supplies the major surface water runoff from annual snowmelt. The lower basin is a plains area where water is used by municipalities, industry, agriculture, and for recreation.
The Phase I report noted that the lower basin has a drainage area of approximately 177 square miles, and included Ralston Creek, Leyden Creek, Lena Gulch, Little Dry Creek, and Van Bibbler Creek. The Phase I report additionally noted,
There are no major on-stream reservoirs in the Clear Creek basin to regulate and control the stream flows. Most of the unappropriated native flows occur during the spring runoff season. Unless new reservoir capacity is provided to store water in the basin, these native flows cannot be fully utilized by the existing water users.
The Phase I report noted that the original Clear Creek Reservoir site had a storage capacity of 35,000 acre-feet. The Phase I report identified twelve alternate storage projects "to develop all or most of the potential firm yield from the storable native flows in the basin." The Phase I report rejected the original Clear Creek storage site based upon the constraint posed by Interstate Highway 70, its high safe-yields costs, and the environmental impact of a dam at the confluence site, among other reasons.
The Phase I report stated that, "[i]f a large dam is constructed in Clear Creek Canyon, U.S. Highway 6 would have to be relocated or abandoned. The relocated highway would be up to 600 feet above the existing canyon floor and would require deep excavation cuts in the steep canyon walls, several tunnels, and several bridges." The Phase I report concluded that, while several storage sites existed in Clear Creek Canyon to store 110,000 acre-feet of water, the unit cost for storage was high when the cost of relocating U.S. Highway 6 was considered.
On February 29, 1988, the Alliance filed an application for change of its conditional right to store 110,000 acre-feet of water in the proposed Clear Creek Reservoir originally decreed in case number 81CW418, in 1983.[4] The application proposed the following *1351 four alternate places of storage for the conditional water right: (1) the Tunnel No. 1 Reservoir; (2) the Tunnel No. 3 Reservoir; (3) the Bald Mountain Reservoir; and (4) the Guy Gulch Reservoir. The Alliance alleged that the Tunnel No. 1 Reservoir had a total capacity of 110,000 acre-feet, that the Tunnel No. 3 Reservoir had a total capacity of 110,000 acre-feet, that the Bald Mountain Reservoir had a total capacity of 110,000 acre-feet, and that the Guy Gulch Reservoir had a total capacity of 35,000 acre-feet. All of the proposed reservoirs, with the exception of the Guy Gulch site, were located on Clear Creek downstream from the original site at the confluence of Clear Creek and North Clear Creek, and upstream from the City of Golden. The Alliance stated in its application that it was "not requesting to enlarge, expand or increase the quantity of the decreed conditional water right nor [was] it attempting to change the character, purpose or place of use."
The City of Golden, the Lower South Platte Water Conservancy District, the City of Westminster, the City of Northglenn, and the City of Thornton (the objectors) filed statements of opposition to the Alliance's application. The City of Thornton alleged in its statement of opposition that it owned substantial water rights in the South Platte River and its tributaries, including Clear Creek, and that any decree must prevent injury to Thornton's rights.
On May 25, 1988, the Division Engineer of the Division of the State of Colorado Division of Water Resources provided to the water court a summary of a consultation held on May 11. The Division Engineer stated,
Applicant seeks Court approval of a change of water right for Clear Creek Reservoir that would allow storage of this water right at four alternate storage sites. Apparently, a storage site has not been selected yet. It appears this water right may not be as feasible as first thought.
It will be difficult to evaluate the question of injury until the actual location and size of the storage structure has been determined.
In June 1989, the Tudor Engineering Company completed the second step of the Phase I report (the step two report) concerning estimates of firm water supply yield, overall project costs, and unit costs of firm yield for a variety of project configurations.[5] The step two report noted that "a reservoir of at least 100,000 [acre-feet] capacity would be needed to produce a firm water supply yield that is both sufficient in quantity as well as potentially cost effective for the project sponsors." The step two report concluded that "[a] large dam in Clear Creek Canyon is required to meet the water supply goals of the project (to develop at least 35,000 [acre-feet] of native Clear Creek water). This will require a reservoir with a capacity of 175,000 to 230,000 [acre-feet]. Respective dam heights would range from 490 to 540 ft." The step two report stated in summary,
The main project features would include a large dam and reservoir located in Clear Creek Canyon, and relocation of that portion of U.S. Highway 6 that runs through the canyon. Conceptual designs and cost estimates were developed during Step 2 investigations for only one of several potential damsites in Clear Creek Canyon. This site, the Centennial damsite located approximately two miles west of Tunnel No. 3, is considered representative of the damsites available in the canyon. To fully develop Clear Creek water, a dam of about 500 feet in height would be needed. Capital costs of approximately $400 million have been estimated *1352 for a project of this magnitude, including the cost of relocating U.S. Highway 6. The plans for project development should consider the needs of local communities and users of U.S. Highway 6; our preliminary studies indicate that a project can be developed that will meet these needs.
....
The next step in project development should include further evaluation of the plan for U.S. Highway 6 relocation. The evaluation should consider the long-term needs of the local communities, the highway users, and the Clear Creek water users. Future phases of project planning will require additional investigations to select a specific dam and reservoir site in Clear Creek Canyon, and to identify the environmental and socioeconomic issues to be addressed in an environmental impact statement.
The step two report recommended that one or more specific dam and reservoir sites be selected in Clear Creek Canyon.
On November 15, 1989, a water referee entered a ruling concluding that the Alliance "has exercised reasonable diligence in the development of the [conditional] water right to store 110,000 acre-feet of water in Clear Creek Reservoir." The water referee noted that the Alliance "undertook obligations to pay for engineering and feasibility studies for the storage project." The water referee additionally noted that
the Alliance explored the feasibility of the construction of proposed reservoirs at alternate places of storage for the original water storage right as decreed in Case No. 81CW418. Two of the alternate sites, being the Guy Gulch Reservoir and the Bald Mountain Reservoir, were previously filed on by two Alliance members.... The Alliance is continuing to explore legal and factual issues associated with the alternate places of storage as a means to perfect its conditional water rights.
In December 1989, the water court entered an order confirming the ruling of the referee in case number 87CW206. In its order, the water court noted that "[n]o protest to the ruling of the referee has been filed."
On December 29, 1989, the Alliance amended its application for change of water right to include a fifth proposed storage site, the Centennial Reservoir. The Alliance alleged that the total capacity of the Centennial Reservoir would be 230,000 acre-feet.
On June 25, 1992, the Alliance filed a motion in limine to preclude the objectors from challenging the following issues:
1. Whether the project can and will be completed with diligence and within a reasonable time.
2. Whether the Alliance is entitled to retain the filing date and appropriate [sic] date of the original reservoir site or whether alternate places of storage sought herein should be administered as junior to all water rights for which applications had been filed or decrees entered prior to 1988 and awarded new appropriation dates.
3. Whether the Alliance has a specific plan and intent to divert, store or otherwise capture, possess and control a specific quantity of water for beneficial uses or whether the project is speculative.
4. Whether the Alliance has been diligent in the perfection of the conditional water right sought to be changed.
5. Does Applicant have authority to construct reservoirs at the claimed sites.
The Alliance noted in its motion that the water court had previously determined that the water "right was being diligently developed in ruling on Case No. 87CW206." The Alliance contended that the water court previously determined that the Alliance "can and will" develop the project with diligence within a reasonable amount of time. Thus the Alliance argued that the objectors had a full and fair opportunity to contest the issues in the separate case and should therefore be collaterally estopped from attacking them in the present case.
On August 25, 1992, the water court entered an order stating that "[a]ll Objectors confess Motion in Limine and matter proceeds to trial on September 2, 1992." *1353 Two days later, the City of Golden entered into a stipulation with the Alliance wherein the City of Golden agreed not to oppose the Alliance's application and the Alliance agreed to subordinate its water right to the right owned by the City of Golden. The City of Northglenn had previously withdrawn its statement of opposition.
On September 2, 1992, a one-day trial commenced. The Alliance presented two witnesses: Virgil Hill (Hill), the former president of the Alliance, and Ross Bethel (Bethel), a water engineer. Hill testified that he had been a member of the Alliance since its inception in 1980, but was presently not a member. Hill additionally stated that he did not know where the Alliance would construct a reservoir at that time. Hill stated that, "[w]ithout additional studies, [he] [could not] tell ... which, if any, or all [of the reservoirs], will be built based upon the more detailed studies. There may be smaller reservoirs at all of those locations to attain the yield." After the Alliance presented Hill's testimony, the water court directed counsel for the City of Thornton to "think about the organization of [its] case." The water court found that the City of Thornton was attempting to litigate issues previously confessed to in the motion in limine.
The Alliance next presented the testimony of Bethel, an expert witness in water resources engineering. Bethel testified that he was hired as a consultant during step two of the Phase I study, and assisted in the preparation of the step two report. Bethel stated,
We determined ... that the water physical water availability of the Clear Creek Reservoir Site is approximately 90 percent of the physical water availability that occurs down at the Tunnel # 1 Site. So, there basically are inflows in between the reservoir sites. And that was one of the conclusions that we derived from our analysis.
A second important part of our analysis is the water right considerations. And the primary conclusion of our investigation there was that there are no water rights located in between their original reservoir site and the proposed alternate sites. We, of course, recognized there are a large number of water rights that exist downstream of the Tunnel # 1 Site....
The third primary analysis and review that we performed was related to the water availability to the alternate reservoir sites in comparison to the original reservoir site. And by "water availability" I'm not talking just about the physical water availability, but also the legal water availability.
....
... [B]ecause of the legal water availabilities constraint and not the physical water availability, the water availability to any of these sites is the same. It is not influenced by the location in this reach here.
Bethel additionally testified that he had not identified a point of diversion or a rate of flow associated with the diversion for the Guy Gulch Reservoir site. Bethel emphasized that "the water availability at the original site and the alternate sites remains the same regardless of the place of storage, because of the need to pass such a large proportion of the physical flows for downstream water rights."
During the trial, the water court asked counsel for the Alliance how injury could be determined in the case of the Guy Gulch reservoir site, since no point of diversion had been identified for that site. Counsel for the Alliance responded by noting that all of the proposed sites, with the exception of Guy Gulch, were "all onstream reservoirs on Clear Creek, and obviously the taking from Clear Creek would be right at that point. As for Guy Gulch, the application does not plead specifically a point of diversion, and we recognize that." No further reference was made to the diversion point of the Guy Gulch site.
The City of Thornton was the only objector who appeared. The City of Thornton presented one witness, Evan Ela (Ela), who was employed by the City of Thornton as a water resources administrator. Ela testified that "Thornton is located at the north *1354 end of Clear Creek and extends north from that location for several miles." Ela stated that the City of Thornton owns water rights on Clear Creek that are located below the rights belonging to the Alliance. Ela testified that the City of Thornton, for example, had a decree to store 3,600 acre-feet of water that was seven days junior to the Alliance's right to store 110,000 acre-feet of water. Ela stated that
the water right originally was granted for 110,000 acre feet at the original location. And then numerous studies were done through the Water and Power Authority here in Colorado and they determined that the ... original site could store 35,000 acre feet.
And we feel that any movement of the water from that location to try and garner someplace to store the remainder of that water right is an enlargement of use over what the intent was at the original location, and that that would injure us.
Ela testified that water courts generally retain jurisdiction for periods of five to ten years after the date of entry of the decree. Ela additionally stated that he thought it unlikely that the Alliance would construct the project within two years.
At the conclusion of the trial, the water court granted the application and entered a judgment and decree as proposed by the Alliance. The water court specifically ruled as follows:
The Court finds, specifically, that the changes of rights approved in the application are changes of water rights which are contemplated by law as set forth in [sections] XX-XX-XXX(5), XX-XX-XXX(1)(a), [and] XX-XX-XXX(3). Pursuant to XX-XX-XXX[ (3) ], the Court is to grant the application if there is no injury.
The testimony by the applicants is that there is no injury to relevant water rights. That was Mr. Bethel's testimony. The basis of that testimony and conclusion are found in the Applicant's Exhibit A-1. Mr. Ela testified that there would be injury to certain water rights belonging to Thornton; however, Mr. Ela does not really give a basis for his opinions, stating that more information is needed.
It appears to the Court that much of that information is availablecertainly the history of flow on Clear Creek is available, the points of diversionalthough not specifiedcan be reasonably determined.
The most relevant argument to this application that has been set forth by the City of Thornton is its assertion that the application and amended application in 88CW34 are expanding the conditional water right which was decreed in 81CW418. The Court disagreesin fact, the evidence is to the contrary. An alternate point of diversion, first of all, by definition, does not do that. Secondly, paragraph 4(c) of the proposed decree under "terms and conditions" states specifically that: "Storage of water at the alternative storage sites approved herein shall be limited to the quantity of water which is physically available in priority at the original place of storage described in paragraph 12."
That gives adequate assurance that Thornton's agreement will not be realized. The Court is somewhat concerned over the fact that there are not points of diversion specified for any of these alternative storage places. Guy Gulch seems to be the biggest concern, and is the biggest concern to the Court. There's no point of diversion specified, but the only evidence is that there are no intervening water rights that are concerned with any possible diversion point.
Again, the burden has been met to show that there would be no injury at this point.
The Court is going to retain jurisdiction over this matter, however, for a period of five years rather than two years as contemplated in paragraph 12. The Court is doing that specifically because there are no points of diversion which are specified. There are five alternative sites which are proposed. The objector is right, to some degree, that until the applicant is more specific about these alternate storage locations and also more specific about what's going to happen in 81CW418, the related casethat it *1355 is difficult to be as specific in their opposition. So, for that reason, the Court is going to expand paragraph 12 to include a continuing jurisdiction for a period of five years.
Other than that, I will sign the proposed decree.
The City of Thornton filed the instant appeal pursuant to section 13-4-102(1)(d), 6A C.R.S. (1987). We separately address the issues raised on appeal.

II.
The City of Thornton contends that the water court erred as a matter of law by not applying the contemplated draft doctrine as developed by this court in Twin Lakes Reservoir and Canal Co. v. City of Aspen, 193 Colo. 478, 568 P.2d 45 (1977). The City of Thornton contends that the facts of the present case dictate that the contemplated draft doctrine, and not the original amount of a decreed conditional right to store water, must serve as the basis for evaluating injury in the present case. The City of Thornton contends that the water court extended and enlarged the impact of the reservoir's conditional water right far beyond the appropriator's original contemplated draft by granting the Alliance's application. We disagree.

A.

THE TWIN LAKES DECISION
The Twin Lakes Reservoir and Canal Company (the Company) operated the Independence Pass Transmountain Diversion System, which diverts water from streams constituting the headwaters of the Roaring Fork River in Western Colorado through a tunnel to the Arkansas River Basin in Eastern Colorado. See Twin Lakes Reservoir & Canal Co. v. City of Aspen, 192 Colo. 209, 557 P.2d 825 (1976) (Twin Lakes I). Prior to the 1970s, the Company had an absolute right to use 54,458 acre-feet of water annually for irrigation of agricultural areas. In Twin Lakes I, the Company filed an application for additional conditional water rights from various streams in Western Colorado to ensure that "`it has a decreed right to all water which it can physically gather for diversion through its [t]unnel.'" Id. at 212, 557 P.2d at 827 (quoting the water court ruling). This court reversed the water court ruling denying the Company's application for additional conditional water rights. Id. at 215, 557 P.2d at 829.
In Twin Lakes Reservoir and Canal Co. v. City of Aspen, 193 Colo. 478, 568 P.2d 45 (1977) (Twin Lakes II), the case upon which the City of Thornton presently relies, the Company filed an application for a change of use of the previously decreed water rights. Id. at 481, 568 P.2d at 48. The original decree permitted the Company to use the water for irrigation. The Company, however, sought to use the water for irrigation, domestic, commercial, industrial, municipal, and "all beneficial" uses. Id. at 482, 568 P.2d at 48. The City of Aspen and the Colorado River Water Conservation District, among others, objected to the change in use. After entering into a stipulation with the Company, however, the District withdrew its objection. Id. at 481, 568 P.2d at 48. The stipulation provided that the transmountain diversions would be limited to 68,000 acre-feet annually. The water court incorporated the provisions of the stipulation into a decree which granted the Company's application.
On appeal, the objectors argued that:
"II. The right to change the use of a conditional water right is limited by the extent of its use before the change, insofar as the conditional aspects have been completed, and by the extent of its use contemplated at the time of the original appropriation, that which would have resulted if completed and used as intended at the time of the original appropriation, insofar as the conditional aspects have not been completed.
"....
"IV. The terms and conditions imposed with the water court do not adequately protect other appropriators and users of water rights from injury."
Id. at 482, 568 P.2d at 48. We first reviewed the water court rulings. We noted *1356 that, with respect to "the question of draft on the stream contemplated at the time of the original appropriation," the water court ruled as follows:
"Since the contemplated draft of the original appropriation ranged from 40,000 to 80,000 [acre-feet] per annum, and since the actual need for IPTDS water existed, and still exists, on the Project Lands greater than 60,000 [acre-feet]..., it is clear that the change [in use] decree sought by the [Company] does not involve an expanded use over that contemplated in 1936. Accordingly, the court concludes that the change sought does not amount to an enlarged use over the original appropriation."
Id. at 484, 568 P.2d at 49. We subsequently stated,
In the consideration of change of points of diversion and of use, we are accustomed generally to situations in which the water remains in the same watershed. In such cases, two of the primary factors to be considered are any change in the consumptive use of the water and any change in return flow to the stream from irrigation.
Id. at 484, 568 P.2d at 50. We found, insofar as the Western Colorado water users were concerned, that there was a 100% consumptive use once the water passed into the transmountain diversion tunnel. Id. We found that there was a single issue to be considered in that appeal: whether the objectors would "be injured because more IPTDS water will go through the tunnel and be lost to Western Colorado under the municipal use than would be the case in the future without the change of use." Id. at 485, 568 P.2d at 50.
We concluded that the objectors would not be injured by the Company's future change in use. In so holding, we emphasized the fact that the parties had stipulated to a decreed annual operating limit. Id. We thus affirmed the judgment of the water court granting the Company's application for a change of use.

B.

APPLICATION OF TWIN LAKES II TO THE PRESENT CASE
The City of Thornton contends that, under Twin Lakes II, the Alliance's consumptive draft should be limited to 35,000 acre-feet of water since that is the amount that can actually be stored in the original site, the Clear Creek Reservoir. The City of Thornton contends that the water court should have "determine[d] the impact to juniors which would result if the conditional water right were operated in the manner contemplated by the original appropriator, in light of the practical constraints faced by that appropriator." The City of Thornton posits that the Alliance has "simply tied up Clear Creek storage sites until its members decide to obtain independent water rights at those sites." We disagree.
The Twin Lakes II court concluded that there was no expanded use based in part on the fact that the parties had agreed upon an annual operating limit. Twin Lakes II, 193 Colo. at 485, 568 P.2d at 50. In the present case, the City of Thornton, by confessing to the motion in limine, conceded that the Alliance has a conditional right to store 110,000 acre-feet of water at the Clear Creek Reservoir site.[6] Thus, the City of Thornton cannot now argue that the Alliance can only store 35,000 acre-feet of water at the Clear Creek Reservoir site.
In Twin Lakes II, we considered the issue of whether junior interest owners would be injured if more water passed through the transmountain diversion tunnel, from western Colorado into eastern Colorado. We concluded that the junior interest owners would not be injured because we found that there was no expanded use over the contemplated draft. Id. at 484, 568 P.2d at 49. In the present case, the water court reached a similar conclusion regarding expansion of use. The water court concluded that, contrary to the City of Thornton's contentions, the evidence in the case demonstrated that storage *1357 of water at any of the alternate sites would be limited to the quantity of water physically available in priority at the original Clear Creek Reservoir site. The water court concluded that there would be no injury to the City of Thornton because of the term and condition limiting the conditional right to one of storing only 110,000 acre-feet of water. The water court noted that there was no point of diversion specified with respect to Guy Gulch, but that there were additionally no intervening water rights concerned with any diversion point. Thus the water court did, as the City of Thornton contends it should have, consider the impact to junior interest owners which would result if the conditional water right were operated in the manner contemplated by the original appropriator. We find the City of Thornton's contentions to be unpersuasive and reject them.

III.
The City of Thornton contends that the Alliance has a "blanket decree" which will necessarily reduce the amount of water available to water users below the alternate reservoir sites. The City of Thornton additionally contends that the blanket decree is not permissible in light of this court's ruling in Hallenbeck v. Granby Ditch and Reservoir Company, 144 Colo. 485, 357 P.2d 358 (1960). We disagree.

A.

The Hallenbeck Decision
In 1907 and in 1937, the Granby Ditch and Irrigation Company (the Granby Company) acquired rights to store water in a system of reservoirs. The Granby Company subsequently filed a petition "for a decree entitling it to store water decreed to its system of reservoirs in whatever location and sequence it saw fit within the systema so-called `blanket decree.'" Hallenbeck, 144 Colo. at 486, 357 P.2d at 359. Several parties objected and argued that water previously available to them would now be stored by the Granby Company, and "that the decree to the extent that it exceeded the original capacity was void since there is an implied limitation in every decree which restricts storage rights to actual capacity." Id. at 490, 357 P.2d at 361.
At trial, an engineer testifying on behalf of the Granby Company stated that "if the relief ... were granted less water would flow down the creek than now flows." Id. at 491, 357 P.2d at 362. At the conclusion of trial, the trial court "concluded that by granting the petition and holding that the decrees previously entered be strictly observed, [the Granby Company] will not be allowed to take more water than was previously decreed to them in 1907 and 1937." Id. at 493, 357 P.2d at 363. The objectors appealed.
We first noted that the action was governed by section 147-9-22, which permitted owners of water rights to file petitions to change "the location of reservoirs or other structures for storing water." § 147-9-22, 6 C.R.S. (1953); Hallenbeck, 144 Colo. at 494, 357 P.2d at 363. A petition filed under that section was required to state the new point of location sought by the owner, and to state whether the proposed change would "injuriously affect the vested rights of others." § 147-9-22(7), 6 C.R.S. (1953). If the petition asserted that the vested rights of others may be injured, then the owner was required to provide terms and conditions "to prevent such injurious effect and to protect the parties affected." Id.
We found that the decree "violates the basic and fundamental requirement of the statute that the new point of location be specifically set forth. Petitioner was required to show its proposed change with particularity." Hallenbeck, 144 Colo. at 494, 357 P.2d at 363. We next found "that injury to junior right holders was threatened" because petitioner Granby Company "admit[ted] that less water would flow downstream as a result of the changes." Id. at 495, 357 P.2d at 363. We then found that the Granby Company failed to suggest terms and conditions to prevent the injurious effect. Id. at 498, 357 P.2d at 364. We finally found that the trial court failed to consider the evidence "with reference to specific and particular invasion of vested *1358 rights." Id. at 498, 357 P.2d at 365. We thus reversed the judgment and remanded the cause.

B.

Application of Hallenbeck to the Present Case
The City of Thornton contends that this case is controlled by Hallenbeck since it involves a "blanket decree," which must be deemed invalid by virtue of its comprehensive character. We disagree.
Hallenbeck was decided under section 147-9-22, 6 C.R.S. (1953), which was repealed in 1969.[7] The Alliance's application is governed by section 37-92-305, 15 C.R.S. (1990). Section 37-92-305(3) provides,
A change of water right ... shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. In cases in which a statement of opposition has been filed, the applicant shall provide to the ... water judge ... a proposed ruling or decree to prevent such injurious effect....
§ 37-92-305(3), 15 C.R.S. (1990). Neither that section, nor section 147-9-22, expressly prohibits granting an application for change of a right to store water which seeks to add sites to an existing right to store water at a single site. Unlike its statutory predecessor, section 37-92-305 does not require applications for change of location of a water storage facility to include "the new point of location." See § 147-9-22(6). The section requires applicants to submit proposed decrees designed to prevent injurious effect when a statement of opposition is filed. § 37-92-305(3).
The water court ruling granting the Alliance's application for alternate places to store water contained the following terms and conditions:
A. The changes awarded herein shall apply to 110,000 acre-feet of storage capacity in any of the alternative storage reservoirs. Therefore, any additional storage capacity owned or utilized by the Alliance may only be utilized to store water under priorities other than the priority described ... above.
B. If the Alliance seeks to utilize a storage reservoir with a capacity greater than [] 110,000 acre-feet or seeks to utilize a series of reservoirs with a combined capacity greater than 110,000 acre-feet, it shall designate through an accounting form satisfactory to the State Engineer what priority the Alliance is utilizing to store water and that under the priority described ... above it is storing no more than 110,000 acre-feet.
C. Storage of water at the alternative storage sites approved herein shall be limited to the quantity of water which is physically available in priority at the original place of storage described ... above.[8]
The water court stated at trial that the terms and conditions, by only permitting the Alliance to store 110,000 acre-feet of water, would prevent injury to other water right owners. The water court's decree subsequently stated that compliance with the terms and conditions set forth in the decree would prevent injury to the objectors as contemplated under section 37-92-305(3). Thus, unlike the Granby Company, the Alliance has complied with the governing statutory provisions.
Additionally, in Hallenbeck, an engineer for the applicant testified at trial that less water would flow downstream if requested changes were granted. The Hallenbeck court accordingly determined on appeal "that injury to junior right holders was *1359 threatened," and concluded that the Granby Company's application should be denied because the Granby Company did not suggest terms and conditions to prevent the injurious effect. The water court in the present case, however, found that the Alliance will not store any greater amount of water than that originally decreed.
Based on the facts of this case, we are not persuaded by the City of Thornton's contentions.

IV.
The City of Thornton contends that, "[a]s a matter of law, the period of the water court's mandatory retained jurisdiction to review unanticipated injurious effects of changing a conditional water right[] should not begin to run until the full and actual operation of the water right as changed has begun." The City of Thornton contends that "[i]t is only if and when the reservoirs are built and use begins[] that the water court will be equipped with the operational facts to examine the diversions, use, and return flows to determine whether water users such as Thornton will be injured."
Section 37-92-304(6) governs proceedings by water judges, including retention of jurisdiction to consider whether the rights of water users will be injured. That section provides as follows:
Any decision of the water judge ... dealing with a change of water right[[9]]... shall include the condition that the approval of such change ... shall be subject to reconsideration by the water judge on the question of injury to the vested rights of others for such period after the entry of such decision as is necessary or desirable to preclude or remedy any such injury. Such condition setting forth the period allowed for reconsideration shall be determined by the water judge after making specific findings and conclusions.... The water judge shall specify his determination as to such period in his decision, but the period may be extended upon further decision by the water judge that the nonoccurrence of injury shall not have been conclusively established.

§ 37-92-304(6), 15 C.R.S. (1990) (emphasis added). The section expressly requires water courts, when granting changes of water rights, to incorporate into decrees a condition regarding reconsideration of the question of injury by the water court during "such period after the entry of such decision as is necessary or desirable" to prevent any injury. Id. (emphasis added). Section 37-92-304(6) additionally permits water courts to extend the period upon their determinations "that the nonoccurrence of injury shall not have been conclusively established." Id.
In the present case, the water court stated,
The Court is somewhat concerned over the fact that there are not points of diversion specified for any of these alternative storage places. Guy Gulch seems to be the biggest concern, and is the biggest concern to the Court. There's no point of diversion specified, but the only evidence is that there are no intervening water rights that are concerned with any possible diversion point.
Again, the burden has been met to show that there would be no injury at this point.
The Court is going to retain jurisdiction over this matter, however, for a period of five years rather than two years.... The Court is doing that specifically because there are no points of diversion which are specified. There are five alternative sites which are proposed. The objector is right, to some degree, that until the applicant is more specific about what's going to happen in 81CW418, the related casethat it is difficult to be as specific in their opposition. So, for that reason, the Court is going to... include a continuing jurisdiction for a period of five years.
The City of Thornton contends, however, that the water court will not be in a position *1360 to assess injury until the water right as changed commences operation; according to the City, injury can only arise after the changed water right is exercised. This contention is without merit.
It is well settled under Colorado law that a water court generally may not grant an application for a change in a water right unless the applicant has demonstrated that the change will not injure the rights of other water users. Were we to adopt the City of Thornton's contention, we would render it impossible for water courts to grant applications for changes in water rights. According to the City of Thornton, no injurious effect could be shown until a change had been effected. A showing of no injurious effect, however, is a prerequisite to granting an application for a change. Thus, according to the City of Thornton, applications for changes could never be granted because applicants could not demonstrate a lack of injury at the time of the application. The City's argument is contrary to Colorado law.
Section 37-92-304(6) protects the rights of the City of Thornton insofar as it allows the water court to reconsider the question of injury until it is convinced that the nonoccurrence of injury to the City of Thornton's water rights is conclusively established. The water court found that there was no showing of injury to the City of Thornton at the time it entered the decree granting the Company's application. The water court did note that proving injury in the absence of specified diversion points would be difficult; accordingly, the water court retained jurisdiction for a period of five years. The water court may, under the statute, extend its period of retained jurisdiction if lack of injury is not conclusively established in five years. We reject the City of Thornton's contention.

V.
The City of Thornton contends that "no point of diversion or rate of flow was requested in the application, testified to, or included in the water court's decree." The City of Thornton notes that "every Colorado water right, whether absolute, conditional or changed, must have a point of diversion from its decreed source." Thus the City of Thornton contends that failure to specify a point of diversion for the Guy Gulch off-channel reservoir rendered the decree granting the application erroneous as a matter of law.
The City of Thornton correctly notes in its opening brief, however, that "there is no requirement that the Applicant even identify a point of diversion." Section 37-92-302, 15 C.R.S. (1990), governs applications for changes of water rights; that section does not mandate that applications for change set forth points of diversion. Section 37-92-305 governs standards with respect to water court rulings; that section does not impose an affirmative requirement upon the water court to identify the point of diversion for a changed water right.
The only issue before this court is whether granting the Alliance's application to store 110,000 acre-feet of water in five alternate sites will injure the City of Thornton's water rights. While identification of the point of diversion is relevant to a determination of injury, there is no requirement that a point of diversion be specified in either an application for a change of a right to store water or water court ruling granting an application for such a change. The City of Thornton's contention that the water court ruling is erroneous as a matter of law is not persuasive.

VI.
The ruling of the water court is affirmed.
NOTES
[1] Members of the Alliance, as of May 17, 1983, included the following entities: the Adolph Coors Company, the Agricultural Ditch and Reservoir Company, the City of Arvada, the City of Broomfield, the City of Idaho Springs, the Colorado Rock Products Association, the Consolidated Mutual Water Company, the Crestview Water & Sanitation District, the Farmers Reservoir and Irrigation Company, the Pleasant View Water & Sanitation District, and the Reno-Juchem Ditch Company. The membership of the Alliance has changed, however, since it was first formed.
[2] The decree was entered in case number 81CW418.
[3] The report noted that the Authority was established by the General Assembly in 1981, and that its purpose "is to provide the State with a mechanism to fund water and hydroelectric projects by issuing revenue bonds."
[4] In May 1985, an engineering company prepared a report for the Denver Board of Water Commissioners, analyzing the propriety of constructing a water storage facility in Clear Creek Canyon. The report indicated that the Alliance had applied to the Authority for a feasibility study of the project. The report noted that "[p]resent use made of Clear Creek water is a mix of municipal, industrial, and agricultural. The stream is greatly over-appropriated, with water rights totaling about 20 times the average rate of stream flow and about 50 percent more than the maximum recorded flow during the past ten years." The report concluded that "[t]here are a number of sites in the canyon where a dam could be placed, but reasonable reservoir sites are limited." The report recommended that a dam be constructed at the Guy Gulch site.

The Alliance subsequently asked one of its members to file an application for a water storage right at the Guy Gulch site and at a Bald Mountain site, in order to prevent "claim jumping by someone other than the [Alliance]."
[5] The Tudor Engineering Company prepared the report in association with Cheryl Signs Engineering, Leonard Rice Consulting Water Engineers, Inc., Muller Engineering Co., Inc., and Woodward-Clyde.
[6] The City of Thornton additionally could have, but did not, file a statement of opposition in response to the Alliance's application for a finding of quadrennial diligence.
[7] See § 148-9-22, 7 C.R.S. (1963); Act approved June 7, 1969, ch. 373, sec. 20(1), 1969 Colo.Sess. Laws 1223.
[8] The City of Thornton contends that these conditions are inadequate as a matter of law to prevent any injurious effect. The City of Thornton does not, however, articulate how the conditions are deficient as a matter of law. The City contends that Ela's testimony demonstrated that, without a term limiting the perfection of the conditional water right to the original site, the Alliance would have an enlarged use. The water court concluded that, as a matter of fact, the evidence supported a contrary conclusion.
[9] "The term `change of water right' includes changes of conditional water rights as well as changes of water rights." § 37-92-103(5), 15 C.R.S. (1990).